## IN THE COURT OF APPEALS OF IOWA

No. 15-0761
Filed September 23, 2015

**IN THE INTEREST OF P.D. AND K.D.,**
**Minor Children,**

**B.D., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Woodbury County, Julie A. Schumacher, District Associate Judge.

A mother appeals the termination of her parental rights to her children born in 2010 and 2012. **REVERSED AND REMANDED.**

Daniel Vakulskas of Vakulskas Law Firm, Sioux City, for appellant mother.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, Patrick Jennings, County Attorney, and J. Kirsch, Assistant County Attorney, for appellee State.

Kathryn Stevens, Sioux City, attorney and guardian ad litem for minor children.

Considered by Vaitheswaran, P.J., and Potterfield and McDonald, JJ.

**VAITHESWARAN, Presiding Judge.**

A mother appeals the termination of her parental rights to two children, born in 2010 and 2012. She contends the State failed to prove the grounds for termination cited by the district court and termination was not in the children's best interests.

## I.     *Background Facts and Proceedings*

The Department of Human Services became involved with the family in the fall of 2013 after learning that one of the children had "a significant diaper rash" and "severe head lice." Additionally, the children's mother left the children with their great-grandparents so she could spend time with her husband, who was serving in the military and was stationed in another State. She did not inform the caretakers where she was going. Concerns were expressed about the mother's mental health and her ability to parent the children.

The district court ordered the children removed from the mother's care. They were subsequently adjudicated in need of assistance and the district court required the parents to "participate in couples counseling; participate in parenting classes; [and] participate in visitations as arranged by the Iowa Department of Human Services, in consultation with the guardian ad litem." In addition, the court ordered the mother to "complete a psychiatric evaluation and follow through with the recommendations of that evaluation."

The mother returned to Iowa and cooperated with services. She underwent a psychiatric evaluation, which resulted in current diagnoses of "major depressive disorder, recurrent moderate" and anxiety disorder (not otherwise

specified). She began therapy but was unable to continue due to non-payment of an outstanding bill.

The mother also participated in visits with her children. Initially, those visits were supervised and took place twice a week for two hours each time. Later, they were expanded to two semi-supervised five-hour visits per week, in her apartment.

The mother generally maintained the cleanliness of her apartment and interacted appropriately with the children. The provider's primary concern related to the mother's tendency to fall asleep and her occasional failure to wake up for a visit. The service provider admonished the mother to stay awake during visits.

A year after the department became involved, the district court found the mother "made progress toward reunification." The court noted "she maintained employment and an apartment," used "bus passes for transportation as needed," and was "compliant with taking her medication for depression." The court found the mother was "able to demonstrate consistency, appropriate discipline, and routine" and needed "to continue to demonstrate stability with mental health and management of her home and money." The court granted the parents six additional months to work towards reunification and scheduled a review hearing in three months.

The first visit following entry of the extension order was canceled because the mother overslept. The mother also overslept prior to another visit. Although she noted a friend was assisting her with finances and her husband was to pay the outstanding therapy bill, she continued to have financial difficulties.

Based on these setbacks, the department "made the decision to revert [the mother's] visits back to fully supervised, twice per week." The department opined, "[t]he parents have stopped making progress toward reunification and appear to be in the same situation they were in at the last hearing."

The district court accepted this prognosis at the three-month review hearing and ordered the State to file a termination petition. Three months later, the court terminated the parents' rights to their children pursuant to Iowa Code sections 232.116(1)(d) (2013) (circumstances that lead to adjudication as a child in need of assistance continue to exist despite the offer or receipt of services), (f) (child four or older cannot be returned to parent's custody), (h) (child three or younger cannot be returned to parent's custody), and (i) (requiring proof the child meets the definition of a child in need of assistance based on a finding of physical or sexual abuse or neglect, there is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child, and there is clear and convincing evidence that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time). Both parents appealed, but the father's appeal was dismissed as untimely.

## II.     Termination Grounds

The mother contends the State failed to prove termination was warranted under sections (d), (f), and (h). The mother does not challenge the court's reliance on section (i). Accordingly, we conclude the State proved termination was warranted under section (i). *See In re W.R.*, No. 03-0789. 2003 WL 21362658, at *2 (Iowa Ct. App. June 15, 2003) (affirming termination decision on

unchallenged ground); *see also In re S.R.*, 600 N.W.2d 63, 64 (Iowa Ct. App. 1999) (we may affirm if we find clear and convincing evidence to support any of the grounds cited by the juvenile court).

### III. Best Interests

Termination must be in the children's best interests. *In re P.L.*, 778 N.W.2d 33, 37 (Iowa 2010). As the district court noted, the primary considerations on the best interest issue are "the child's safety," "the best placement for furthering the long-term nurturing and growth of the child," and the "physical, mental, and emotional condition and needs of the child." *Id.*

In granting six additional months to reunify, the district court set forth clear expectations for the mother. She was to (1) work with service providers in keeping "a clean and orderly home," (2) work with the service provider on "managing and budgeting her finances," (3) "address past-due medical bills," and (4) attend a co-parenting class with her husband. The mother fulfilled each of these expectations.

The cleanliness of the mother's apartment was of little concern. At worst, the service provider noted a dog smell which, she stated, could be alleviated by airing out the apartment. In any event, the father, who was the owner of the dog planned to move out of the apartment. While the service provider also cited the mother's failure to pick up toys following a previous visit, she acknowledged the apartment was generally clean. There is no question the mother's housekeeping skills raised safety concerns in the past. However, the mother addressed the concerns. There was scant if any evidence that the condition of the apartment posed a safety risk to the children at the time of the termination hearing.

Turning to the parents' finances, the mother told the service provider she did not have a great deal of money to work with. To improve her financial situation, the mother changed her job to one that afforded her more hours. At the time of the termination hearing, she was working thirty-three to forty-five hours per week. She was current on her rent payments and had paid down a utility bill. While she did not avail herself of the budgeting services offered by the service provider who supervised visits, she obtained assistance elsewhere and established she was able to make ends meet. In short, the mother equipped herself to meet the children's physical needs and did so without the department's assistance.

The mother also addressed "past-due medical bills" as required by the court. As of the termination hearing, she had qualified for Medicaid and had dealt with the outstanding bill for mental health services that impeded her ability to continue with therapy. The mother testified she had been seeing a therapist weekly for six to eight weeks prior to the termination hearing. During that period, she missed only one appointment, which she rescheduled. Her concerted efforts to continue mental health treatment inured to the benefit of the children.

The mother registered for two sessions of eight co-parenting classes. Although she was obtaining a divorce from her husband, she acknowledged the need to work with him on parenting the children.

In addition to fulfilling the expectations set forth in the order granting a six-month extension, the mother regularly participated in visits with the children. The order extending time was entered on September 16, 2014. The mother engaged in semi-supervised visits on September 17, 24, 29, October 1, 8, 13, and 15. On

October 20, the mother was informed the visits would become supervised and would be reduced from five hours to two hours. The mother participated in supervised visits on October 20, 27, 29, November 3, 5, 12, 14, 17, 24, 26, December 1, 3, 8, 22, 29, 31, January 5, 14, 16, 21, 23, February 4, 6, 9, 11, 16, 18, 23, March 2, 4, 6, 9, 11, 16, 18, 23, 30, and April 6.[1]

The mother rarely missed visits. During the six-month period preceding the termination order, the mother overslept on September 22, called in sick on October 6 and October 20, and had a December 12 visit cancelled because she failed to confirm her availability before the designated call-in time of 8:45. Three other visits were canceled by the service provider.

During the visits, the mother provided lunches and snacks, engaged in craft activities with the children, and interacted appropriately with them. In its final report, the department noted the mother "does a good job addressing behaviors the girls have during the visits."

We recognize the mother dozed off during portions of certain semi-supervised visits, primarily while the children were napping or watching a movie or when her husband was present for the visit. We are not convinced this factor warranted termination of her parental rights. The mother was working long hours, attempting to manage her financial affairs, addressing deep-seated depression, maintaining her apartment, and dealing with her imminent divorce. She also had to attend her therapy and other appointments without a car or license. The fact she fell asleep on occasion was not surprising.

---

[1] During the last month, the department reduced the visits to one per week.

We are more concerned with the older child's behaviors, including tantrums. A clinical assessment performed days before the termination hearing cited the foster parents' report of "increased anxiety symptoms." The child also began calling the mother by name to get a reaction from her and, during one of the final visits with the mother, turned away when the mother tried to give her hugs. The therapist characterized the child's behaviors as "[i]nappropriate (Guarded)" and recommended individual therapy for the child "to learn healthy, rational, appropriate, and effective ways of expressing self and operationalizing physical and emotional needs and wants."

While this assessment gives us pause, the child showed the same behaviors before the six-month extension. For example, close to one year before the termination hearing, the service provider reported the child did not want to go to visits and had regressed in potty training. The Area Education Association became involved and assisted the child with these behaviors. The record suggests this agency's involvement, together with individual therapy, would be critical in assisting the child cope with the upheavals in her life, regardless of where she was placed.

As for the younger child, the record contains no indication of physical or emotional harm during the extension period.

The mother met each of the department's and court's expectations well within the six-month extension period. The extension would be rendered meaningless if a parent's compliance during the last half of the extension period were discounted based simply on the filing of a termination petition. *See In re A.S.,* 2014 WL 4938010, at *4 ("We do not believe it was proper to discount [the

mother's] improvement from December 2013 through March 2014 simply because the CINA case was on a trajectory toward termination."). Given the mother's achievement of the goals prescribed by the district court in granting a six-month extension, her significant progress during the last three months of the extension period, and the absence of harm to the children other than the harm associated with the many upheavals in the children's lives, we conclude termination of the mother's parental rights was not in the children's best interests.

We reverse the termination of the mother's parental rights to these two children and remand for further proceedings with the permanency goal changed to reunification.

**REVERSED AND REMANDED.**

Potterfield, J., concurs; McDonald, J., dissents.

**MCDONALD, J.** (dissenting)

I respectfully dissent. While the majority cites the statutory best interest standard, the majority does not at all discuss why ordering reunification is in the best interests of these children. Instead, it appears the majority opinion really discusses whether there was sufficient evidence to establish the statutory ground authorizing termination. However, Brittany, the mother, does not challenge the statutory grounds authorizing termination. Given the posture of the case, the only question presented is whether termination of the Brittany's parental rights is in the best interests of these children. In making that determination, we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). After considering the relevant statutory criteria, I conclude termination of the mother's parental rights is in the best interests of the children.

Brittany's past conduct demonstrates her mental health conditions render her unable to provide for the children's safety and unable to meet their physical, mental, and emotional needs outside a supervised setting. *See* Iowa Code § 232.116(2)(a) (providing the court may consider "[w]hether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition"); *In re K.F.*, No. 14–0892, 2014 WL 4635463, at *4 (Iowa Ct. App. Sep. 17, 2014) ("What's past is prologue."); *see also In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (noting a parent's past conduct is instructive in determining future behavior). The majority notes the family came to the attention of the Iowa Department of Human Services ("IDHS") in the fall of 2013. That is true, but it

does not reveal the entire story. Brittany has neglected the children and jeopardized their health and safety for far longer.

In the spring of 2012, Brittany left P.D. with Brittany's stepmother, Jennifer, for one month after K.D.'s birth. During the entire month, Brittany never called her stepmother to check on P.D. The following year, in May 2013, the family came to the attention of the Colorado Department of Human Services following reports of child neglect, including physical and verbal altercations between the parents and unsafe and unsanitary conditions. It was reported that the parents were locking K.D. in her room for hours on end despite her crying, that the children had feces in their beds, that there were feces on the wall in the children's room, and that the floors of the house were littered with dirty diapers and rotten food. The father and his sister largely confirmed the reports during the course of the investigation. The neighbor also confirmed the reports, explaining Brittany did not give the children baths and threw diapers on the floor. The neighbor told the investigator Brittany allowed P.D. to sleep in urine and feces for so long that P.D. developed a skin condition. By the time the investigation was completed, Brittany had moved to Sioux City with the children. The Colorado case was closed as unfounded after the father and his sister spent days cleaning the house in Brittany's absence.

In September 2013, Brittany left the children in Sioux City with relatives and then left Iowa to return to Colorado without informing any of the people caring for the children. Right before leaving, Brittany told her stepmother she had no bond with K.D. but wanted to keep P.D. The relatives took P.D. to seek medical treatment because she had a severe diaper rash. P.D. was diagnosed

with a severe yeast infection. It was also disclosed at that time that the children had severe head lice and that both children had suffered from untreated diarrhea for almost two weeks. The family reported Brittany demonstrated severe mood swings and Brittany told them she was "too stressed to deal with the children." It was at this time, the Iowa Department of Human Services intervened and removed the children from the parents' care.

Although IDHS initiated this case in September 2013, Brittany did not return to Iowa to address any issues with the children until November 29, 2013. She has not demonstrated any greater urgency since that time. In January 2014, Brittany was diagnosed with major depressive disorder, anxiety, and ADHD. She failed to follow through with treatment. Her failure to follow through with treatment was evident during visitation with the children. She did not provide for the children's needs during visits. She frequently missed visitations because she slept through them. When she did exercise visitation, Brittany frequently ignored the children and fell asleep.

By September 2014, the matter came on for dispositional review hearing. The juvenile court found Brittany had made some progress toward reunification. The juvenile court noted she had maintained employment, had been taking her medication, and had been compliant with her mental health therapy. The court also noted that concerns persisted regarding Brittany's struggles with budgeting, her mental health, and the cleanliness of her home. The juvenile court granted the parents an additional six months to complete expected behavioral changes. It was revealed during the subsequent termination hearing, however, that things were not as they seemed. By the time of the dispositional review hearing,

Brittany had actually quit her employment because she was not getting enough hours. She failed to have any alternative employment ready, and she was unemployed from August through December of 2014.

Despite being given six additional months in September 2014 to make changes demonstrating the ability to provide for the children, Brittany's behavior got worse for an extended period of time. As noted above, she quit her employment and failed to address the department's concerns regarding her ability to actually meet the most basic needs of the children. The department decreased Brittany's visitation with the children because she continued to miss visitation and sleep through visitation. She failed to follow through with her therapy. Following a dispositional review hearing in December 2014, the juvenile court found, "[l]ittle, if any, progress has been made since [the] permanency hearing." The juvenile court also found that "[c]oncerns have been raised regarding Brittany sleeping during visits and oversleeping, causing her to miss several of the scheduled visits. The children presented as overly tired, displaying behavior issues and night terrors."

Immediately prior to the termination hearing, Brittany started to make some improvements, but there is little evidence she would be able to maintain them based on her lack of progress since she first abandoned her child in the spring of 2012, more than three years prior to the termination hearing. Indeed, at the termination hearing, Brittany testified she missed another mental health appointment scheduled at 2:00 p.m. the day before the hearing because she slept through it. When asked why Brittany failed to comply with mental health recommendations, she testified there was "no good reason." We have

repeatedly held that "last-minute" attempts to address long-standing issues, here three years, are not enough to preclude termination of parental rights. *See In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000) ("The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems."); *In re I.V.*, No. 15-0608, 2015 WL 4486237, at *2 (Iowa Ct. App. July 22, 2015) (affirming termination order and stating "the mother's past conduct demonstrates that she was unwilling to avail herself of services when offered and only made a last-minute attempt for litigation purposes"). "A parent cannot wait until the eve of termination . . . to begin to express an interest in parenting." *C.B.*, 611 N.W.2d at 494.

The majority also fails to discuss the impact of its decision on the children. The statute directs the court to determine "whether the child[ren] ha[ve] become integrated into the foster family to the extent that the child[ren]'s familial identity is with the foster family, and whether the foster family is able and willing to permanently integrate the child into the foster family." Iowa Code § 232.116(2)(b). In this case, the children were removed from the mother in the fall of 2013, almost two years ago by the time this decision is filed. During that time, the mother has never progressed beyond supervised visitation. The children refer to their foster parents as mom and dad. They do not call Brittany mom. The foster family is ready to adopt these children. The evidence showed the foster parents have provided the children with a loving and structured home environment in which the children have thrived. In contrast, the evidence showed the girls regressed and acted out when forced to have visitation with their mother. The care coordinator's report to the court explained there was little

bond between K.D. and the mother. The children's integration into and support of the foster family and the lack of bond between the mother and children strongly militate in favor of terminating the mother's parental rights. *See In re S.M.*, No. 14-2088, 2015 WL 800086, at *1 (Iowa Ct. App. Feb. 25, 2015) (affirming termination order where foster family best served the children's mental, emotional, and physical needs); *In re N.L.-S.*, No. 14-2045, 2015 WL 576572, at *5 (Iowa Ct. App. Feb. 11, 2015) ("The mental capacity of a parent and the existence of a preadoptive foster family in the life of a child are relevant considerations in the statutory best-interest analysis."); *In re S.B.*, No. 14-0593, 2014 WL 2600365, at *1 (Iowa Ct. App. June 11, 2014) ("We note the children began to make progress in their developmental deficits quickly after they were placed in foster care."); *In re E.C.-N.*, No. 12-2306, 2013 WL 1225396, at *1 (Iowa Ct. App. Mar. 27, 2013) ("The children are thriving with their foster family but regress and appear traumatized following visits with their mother. [The mother] has been given two years, and a variety of services to learn to parent these children safely and has not complied. The children must not be made to await the structure, consistency, and permanency they deserve.").

The majority's decision directs the juvenile court to make efforts to remove these children from a loving family and reunify them with their mother, who has demonstrated for a period of three years that she cannot provide for their most basic needs. "Children simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable." *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990). For the foregoing reasons, I respectfully dissent.