# IN THE COURT OF APPEALS OF IOWA

No. 21-1786
Filed January 27, 2022

**IN THE INTEREST OF B.A.,**
**Minor Child,**

**A.W-H, Mother,**
Appellant.

_____

Appeal from the Iowa District Court for O'Brien County, David C. Larson, District Associate Judge.

A mother appeals from the termination of her parental rights. **AFFIRMED.**

Kevin J. Huyser, Orange City, for appellant mother.

Thomas J. Miller, Attorney General, and Dion D. Trowers, Assistant Attorney General, for appellee State.

Shannon Sandy, Spirit Lake, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Badding, JJ.

**GREER, Judge.**

In November 2021, the juvenile court terminated the mother's parental rights to B.A. under Iowa Code section 232.116(1)(h) (2021). The mother now appeals, arguing termination is not in B.A.'s best interests, the court should have applied statutory exceptions to termination because of the strength of the bond between the mother and the child, and that she should have received a six-month extension.

**I. Facts and Prior Proceedings.**

B.A. was born in June 2019. In September 2020, the Iowa Department of Human Services (DHS) received concerning reports about A.W.-H., the mother, who was B.A.'s primary caretaker. The allegations included methamphetamine use; incidents of domestic assault between the mother and her paramour, N.S., occurring in front of the child; and the child not being fed enough. DHS approached the mother, who agreed to drug test but did not follow through. A couple of weeks after the initial reports, police entered the home and found unsanitary conditions and small bags of what looked like methamphetamine within the child's reach. Both the mother and her paramour, based on their emotional and physical behavior, appeared to be actively using drugs. The next day, police returned with the DHS social worker. While they were outside speaking with the mother and her paramour, N.S.'s son left the home with the child, and the mother made a statement about leaving Iowa. Because of the exigent circumstances, the child was taken into law enforcement custody and then placed with the father of two of

her half-siblings.[1]  Both the mother and the child subsequently tested positive for methamphetamine, and the mother also tested positive for amphetamines.

Now armed with these findings, DHS requested the mother go through a substance-abuse evaluation.  The evaluation led to the recommendation that she undergo weekly outpatient treatment.  She was discharged from the program due to nonattendance but maintained both at the time of her discharge and at the termination hearing that she was not made aware of the recommendation.  DHS scheduled additional substance-abuse evaluations, but the mother did not attend.  Likewise, DHS also requested a mental-health evaluation, which the mother did not complete.  The mother inconsistently attended visitation with the child, which was scheduled twice a week for two hours each visit, so providers began requiring her to confirm two hours before the scheduled interaction.  The mother struggled to meaningfully engage in Safe Care services, which were eventually discontinued because of her lack of participation, and she continued to drug test only intermittently, still testing positive during her sporadic participation.  Also concerning, the mother told providers she planned to stay in a relationship with her paramour but would not live with him—still, she struggled to find independent housing, did not have a driver's license or vehicle, and remained unemployed.

B.A. was adjudicated a child in need of assistance (CINA) in April 2021.  By that time, the mother was incarcerated for drug-related charges following a raid on her and her paramour's home by law enforcement.  While in the county jail, the mother was able to continue phone and video calls with the child.  But, after she

---

[1] These siblings were also removed from the mother's care, but they are not the subject of this appeal.

pled guilty to both a serious misdemeanor and a felony charge and was transferred to prison, the calls were put on hold—at the time of the termination hearing in August 2021, paperwork was still pending to have visits approved by the prison. However, the social worker also testified at the termination hearing that at least two phone or video calls had occurred between the mother and the child since the mother's transfer to prison, so it is unclear if the lag was with establishing in-person visits or with creating a consistent visitation schedule.

At the termination hearing, the mother testified that neither the jail nor the prison had substance-abuse treatments available to her. But, she was working half days, beginning toward getting her license, attending medication management, and receiving mental-health medication. She claimed to have been sober since a week before her incarceration. The mother was also looking into halfway houses that she could go to after release that would provide substance-abuse programming and let the child live with her. At some point after her arrest, the mother ended her relationship with N.S. and testified she had no plans of rekindling her relationship with him because she did not think he was willing to make lifestyle changes or go to treatment and she did not want to forsake her relationship with the child. And, she testified, a condition of her plea deal was that she would only serve six to eight months. Therefore, she asked the juvenile court for an additional six months to get out of prison and into treatment. The State, on the other hand, remarked that the Iowa Department of Corrections website listed the mother's recall date in February of 2022 and her tentative release in July of 2023. And, the child had not been in the mother's care since being removed in September 2020.

At the termination hearing, testimony reflected that the child was doing well. She was meeting developmental milestones, spending more time with her half-siblings, and was evaluated by Iowa Area Education Agencies (AEA) with no reported concerns. At the time of the termination hearing, the child had been referred to the Child Health Specialty Clinic and A.W.-H. signed the appropriate release to allow for the appointment.

Though the child's current placement is not a long-term option, the State listed a number of family members who were willing to serve as adoptive placements, including one option with an approved home study. One of these options, the maternal aunt K.R., also testified at the termination hearing. She stated that she had recently rekindled her relationship with A.W.-H and, while she had not met the child in person, she was open to being a short-term placement for the child, acting as her guardian, or adopting her. She was also willing to maintain the relationship between the child and the half-siblings.

Ultimately, under section 232.116(1)(h), the juvenile court terminated the mother's parental rights. The juvenile court also terminated the parental rights of S.A., the putative father, who consented to termination.[2]

## II. Discussion.

Our de novo review of a termination of parental rights is a three-step process, beginning with the statutory grounds found in Iowa Code section 232.116(1), then considering the child's best interests under section 232.116(2), and finally considering statutory exceptions under section 232.116(3). *In re P.L.*,

---

[2] The putative father does not appeal.

778 N.W.2d 33, 39–40 (Iowa 2010). But, we need only address the steps challenged by the mother. *See id.* at 40. As she is incarcerated, the mother does not dispute the statutory grounds. Rather, she argues that termination is not in the child's best interests and that the court did not need to terminate given the strength of the bond between the mother and the child. *See* Iowa Code § 232.116(2), (3)(c). She also asserts the juvenile court should have granted her a six-month extension as allowed by sections 232.117(5) and 232.104(2)(b). We take each argument in turn.

### A. Best Interests.

The mother argues termination is not in the best interests of the child. First, she asserts that DHS was not moving to terminate her parental rights to the older half-siblings, so a termination here would impact the bond between the child and her half-siblings and be detrimental to the child. Instead, she believes the juvenile court should have established a guardianship with the maternal aunt, K.R., who was willing to support the relationships between the half-siblings and B.A.

Iowa Code 232.116(2) dictates:

> In considering whether to terminate the rights of a parent under this section, the court shall give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child. This consideration may include . . . the following:
> a. Whether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition or the parent's imprisonment for a felony.

It is true that "[w]herever possible brothers and sisters should be kept together." *In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982). We cannot predict the future of

the mother's relationship with her other children.[3]  But the half-siblings are living with their father and will remain there.  And, living with the half-siblings at their father's house—the child's placement at the time of the termination hearing—is not an adoptive option for B.A.  The mother's guardianship of choice, with her sister K.R., would not keep all of these children together.

As to a guardianship, the mother is right to acknowledge our precedent—Iowa courts are slow to establish guardianships rather than terminate parental rights.  *In re A.S.*, 906 N.W.2d 467, 477 (Iowa 2018); *but see In re B.T.*, 894 N.W.2d 29, 33–34 (Iowa Ct. App. 2017) (remanding for the establishment of a guardianship when a ten-year-old child wanted to be with his mother if she could remain sober, but with his grandmother if the mother could not).  To create a guardianship rather than terminate parental rights under Iowa Code 232.104(2)(d)(1) and 232.104(3)(b)(2), the juvenile court must make a determination that termination of the parent-child relationship would not be in the child's best interests.  Establishing a guardianship for a child this young with a family member she has never met only perpetuates the uncertainty in B.A.'s life.  *See In re A.C.*, No. 19-1634, 2020 WL 110429, at *3 (Iowa Ct. App. Jan. 9, 2020).  While we are hopeful that the mother

---

[3] We do note, however, that these children are older and so subject to a longer time frame before termination.  *Compare* Iowa Code § 232.116(1)(f) (allowing termination when a child four years old or older, adjudicated CINA, has been removed from the parent's custody for at least twelve of the previous eighteen months or for the previous twelve consecutive months) *with* (h) (allowing termination when a child three years old or younger, adjudicated CINA, has been removed from the parent's custody for at least six of the previous twelve months or for the previous six consecutive months).  *See also In re N.P.*, No. 19-2068, 2020 WL 564828, at *2 (Iowa Ct. App. Feb. 5, 2020).  Further, the older children remain in the custody of their father, *see* Iowa Code § 232.116(3)(a), whereas B.A. remained in DHS custody.

will maintain her sobriety, we cannot put off the child's stability in the hopes that the mother can soon begin her journey to becoming a fit parent. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Children simply cannot wait for responsible parenting. . . . It must be constant, responsible, and reliable."). In considering the child's best interests and future permanency, we do not believe a guardianship serves the child.

### B. Bond between the Mother and the Child.

Before terminating parental rights, the juvenile court is required to consider if any of the factors found in section 232.116(3) would permit it to not terminate. *P.L.*, 778 N.W.2d at 39. The mother here contends that, under Iowa Code section 232.116(3)(c), the court did not need to terminate her parental rights because of the closeness of the bond between her and the child. This statutory exception requires "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). The juvenile court declined to invoke the statutory exception. In reviewing this determination, "our consideration must center on whether the child will be disadvantaged by termination, and whether the disadvantage overcomes [the mother's] inability to provide for [the child's] developing needs." *In re D.W*, 791 N.W.2d 703, 709 (Iowa 2010). The parent bears the weight of proving the exception. *In re A.D.*, No. 19-1270, 2019 WL 5063343, at *3 (Iowa Ct. App. Oct. 9, 2019) (citing *A.S.*, 906 N.W.2d at 476). While there was evidence at the termination hearing that pointed to the mother engaging with the child during the visits they did have, the mother was inconsistent in her visitation and, due to her incarceration, had gone months without in-person contact

with the child. *See In re M.L.*, No. 16-1130, 2016 WL 5408172, at *2 (Iowa Ct. App. Sept. 28, 2016) (declining to utilize the exception despite the mother's "good interactions with the young child during the supervised visits"). Countering the strong bond theory of the mother, the social worker testified that the child would recognize the mother but was also aware that the mother was not the one providing her needs. In short, there was insufficient evidence of a bond between the two that should outweigh termination, so we agree with the juvenile court's decision not to invoke an exception to termination.

### C. Six-Month Extension.

The mother's final argument is that the juvenile court should have granted her a six-month extension as she requested at the termination hearing. Iowa Code section 232.104(2)(b) allows for such an extension to be granted to a parent if the court can "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." "The burden is not on the State to prove an extension is not appropriate." *In re K.G.*, No. 18-1187, 2019 WL 719047, at *2 (Iowa Ct. App. Feb. 20, 2019).

In its termination order, the juvenile court stated that it did not believe the additional time would lead to reunification. The mother had not yet completed any substance-abuse treatment program and it is unknown if she can remain sober when not incarcerated. She never progressed from fully supervised visits with the child during the tenure of these proceedings. "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination

under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 40. Here, it is unknown when the mother will be released from prison as she was currently incarcerated on an indeterminate five-year sentence. While the mother expressed good intentions and was hopeful that she could make progress, there is no indication in the record that six months would allow enough time for the mother to be released from prison and both begin and complete the necessary steps towards her stability that she had not started in the seven months before her incarceration. So, we are unable to find that the need for removal would no longer exist at the end of a six-month extension. *See In re A.A.G.*, 708 N.W.2d 85, 93 (Iowa Ct. App. 2005).

**III. Conclusion.**

Because termination is in the child's best interests, the bond between the mother and the child is not strong enough to overcome the need for termination, and we cannot find that the need for termination would not exist at the end of a six-month extension, we affirm the termination of A.W.-H.'s parental rights.

**AFFIRMED.**