# IN THE COURT OF APPEALS OF IOWA

No. 22-0781
Filed July 20, 2022

**IN THE INTEREST OF B.P.,**
**Minor Child,**

**L.P., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Romonda D. Belcher,

District Associate Judge.


        A mother appeals the termination of her parental rights.  **AFFIRMED.**


        Jonathan M. Causey of Causey & Ye Law, P.L.L.C., Des Moines, for

appellant mother.

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

        Jessica Chandler of Chandler Law Office, Windsor Heights, attorney and

guardian ad litem for minor child.


        Considered by Tabor, P.J., Badding, J., and Scott, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2022).

**SCOTT, Senior Judge.**

A mother appeals the termination of her parental rights.[1]  On our de novo review, we find grounds for termination exist, termination is in the child's best interests, and no exception exists to avoid termination.  We affirm.

**I. Background Facts and Proceedings.**

The family came to the attention of the department of human services (DHS) because the father was using methamphetamine while caring for B.P. and L.P.[2] The mother was allowing the father to care for the children while under the influence.  B.P. was born in 2015 and was described in a September 2020 report to the court as having "a lot of needs that makes it more difficult to care for him." The report noted B.P. has experienced a great deal of trauma from being in a home with little stability, substance abuse, and possible domestic abuse.  DHS and the mother agreed on a safety plan where the children were placed with the mother, and the father could not be alone with the children.  The family then lost their housing.  The father was arrested after attacking the mother's car.

B.P. was removed from the mother's custody on July 8, 2020, because she remained homeless, failed to follow through with services set up for B.P., and was unable to care for him.  B.P. was adjudicated a child in need of assistance (CINA) in August.  In its adjudication order, the juvenile court found:

> There ha[ve] been services for this family for the past year to obtain housing, financial support and therapy services for the child.  For months, the mother has been offered services specifically tailored to [B.P.'s] needs, but she had been uncooperative.  She does not have stable housing and reportedly has called the police when she did [not] want to parent.  The mother has left her child in the care of

---

[1] The father's rights were also terminated.  He does not appeal.
[2] L.P. is a younger sibling of B.P. and not involved in this proceeding.

others for extended periods of time. She has repeatedly made statements that she does not want [B.P.] in her care and acknowledges an inability to care for him.[3] The child is the subject of two founded July 23, 2019 child protective assessments . . . for dangerous substances after the mother, though testing negative, knew the father was using methamphetamines while caring for the child and for dangerous substances after a relative living with the child tested positive for methamphetamine. The child was hospitalized, where his needs were met. He is now in a foster home setting where, overall he is doing well, but deteriorates after having contact with the mother. The father is incarcerated. DHS previously placed the child with maternal grandmother, who has expressed an inability to care for him.

The juvenile court made additional findings in its December 2020 dispositional order:

The mother has often reported an inability to care for the child, who has a lot of negative and aggressive behaviors. The mother and child ha[ve] suffered significant trauma. The mother has mental health issues and is now participating in individual therapy to address her anxiety, having attended three sessions and making progress. The mother did not follow through with [Behavioral Health Intervention Services] and counseling for the child and acknowledges her lack of engagement. The child is more talkative in therapy and has medication management. He has been placed in his third foster home due to his behaviors, has been hospitalized, and is scheduled for partial hospitalization. The mother had not been consistent in attending or confirming interactions. DHS reduced the interactions because the child's negative and aggressive behaviors occurred after contact with mother. The mother's last interaction was on September 30, 2020. There is a meeting scheduled for the mother and the child's therapist . . . today, and she is open to engaging in child parent psychotherapy.

On May 20, 2021, in a dispositional review order, the court noted the mother's "inability to acknowledge domestic violence in the home and her lack of insight and follow through [a]ffects on the child." The court observed the mother

---

[3] The supervising social worker testified at the termination hearing that B.P.'s "behaviors are never going away" explaining the child demonstrates aggressive behaviors when "he doesn't recognize what he's feeling." She observed the child's caregiver is "going to need consistency" and be "very nurturing."

was struggling to attend her own and the child's therapy sessions, had not maintained contact with the foster parents to inquire about the child's well-being, and had not attended the child's activities. The mother did not see the child between September 2020 and March 5, 2021, prompting the court's statement, "The mother needs to work on repairing [her] relationship with child and his attachment." The court noted B.P. "attends therapy to process trauma experienced in his parents' care and to address his mental health diagnoses. The child enjoys time with the mother and is sad when she fails to appear for interactions and activities."

On July 1, 2021, the court entered a permanency ruling, again noting the mother continued to struggle to consistently attend mental-health services for herself.[4] The court observed the mother "admits that she has not put forth her best efforts in the last year by not attending therapy and things with the child." Yet, the mother believed that because "she's done everything besides attending therapy," the child could be returned to her. This belief supports the juvenile court's finding the mother "lacks insight of the negative impact of domestic violence or her inconsisten[cy] with her services[ and] visits, on the child."

Nonetheless, the mother was granted a six-month extension to seek reunification. The court found the "child will be able to return home within no more than six (6) months if the following specific factors, conditions and/or expected behavioral changes are made, eliminating the need for the child's removal from the home":

---

[4] The court noted the mother "was recommended to work on attachment and attend trauma parenting, but she did not participate."

attend trauma-informed parenting and or attachment assessment and child's therapy consistently; regularly engage in individual therapy; engage with domestic violence advocate regularly; engage consistently in interactions with the child and progress beyond professional supervision; and provide drug screens, as requested.

In a September 21 permanency review order the juvenile court found:

The mother has attended two therapy sessions to process accountability and identifies her role in maintaining an abusive relationship and the harm it has caused the child. Her own progress, however, was unclear as she was unable to identify signs of an abusive relationship. She has not consistently engaged in her own therapy due to her illness, work schedule or lack of transportation. The mother has made efforts to engage with a new therapist who can see her in person. She has attended telehealth sessions which reportedly were conducted while the therapist was commuting. She has sought additional therapy services. She needs to be able to demonstrate an ability to meet the child's needs.

The court concluded B.P. could not safely be returned to the mother's care because of the "mother's need to address mental health issues and protective capacity."[5] The court stated the mother "needs to continue to address parenting to meet the child's trauma needs." The court found reasonable efforts had been made to date and noted semi-supervised visits were recommended. The court's order emphasized, "*DHS shall ensure the mother has semi-supervised interactions with the child in consultation with the child's therapist.*"

On November 3, the State filed a petition to terminate the mother's parental rights pursuant to Iowa Code section 232.116(d), (f), and (i) (2021) alleging safety concerns remained even after two years of services, the mother was recently

---

[5] The court noted the mother "acknowledges the child was removed from her care due to her inability to keep the child safe" yet "accepted calls from the father from prison and others who are in jail custody" and "does not see a correlation between being a pen pal with those in custody and her ability to care for child and keep him safe."

discharged from parent-only therapy for failing to attend,[6] and was not then participating in her own therapy.

Permanency review and termination of parental rights were scheduled to be tried together in December. The combined hearing was rescheduled for February 18, 2022.

On February 9, the mother filed a motion alleging DHS had failed to provide semi-supervised visits and thus failed to provide reasonable efforts. The court ordered the motion be considered at the February 18 hearing.

The mother had an accountability session with B.P. on February 12—six days before the termination trial. According to the supervising social worker and therapist, an accountability session had been an expectation "since the beginning" and was deemed necessary to move forward with a relationship with B.P. After the accountability session, the mother moved from fully supervised visits to semi-supervised visits. The mother and her therapist had set aside working on domestic-violence issues as they addressed the upcoming accountability session. But the mother had yet to address her own issues of trauma.

On February 22, the juvenile court filed a permanency review order, finding B.P. "should not have to wait any longer for permanency while the parents continue to struggle with addressing their own trauma and lack of engagement in a number of services to prevent the need for removal." The court found reasonable efforts

---

[6] The termination petition alleged parent-only appointments were critical to preparing the mother to complete the accountability work B.P. needs from his mother.

had been made and changed the permanency goal to termination of parental rights and adoption.

On April 12, the juvenile court determined termination of the mother's parental rights was appropriate under Iowa Code section 232.116(1)(f).[7] The mother filed a motion to reconsider, enlarge, or amend, asserting the court made errors in its findings of fact.

On April 25, the court made these additional findings:

> This child has been removed since July 8, 2020 by consent of the mother but has not been in the mother's care since October 2019. During the first year of removal, the mother was not consistent in attending interactions with the child, and until September 21, 2021 had not consistently attended the child's therapy sessions. The mother has continued to struggle with her ability to bond with the child or meet his significant emotional needs, and there is not a secure attachment, despite the interactions attended throughout 2021. As such, and for reasons as stated in prior April 12, 2022 termination order, the child cannot be returned to the mother's care pursuant to Iowa Code Section 232.116(1)(f).

The mother appeals the termination of her parental rights. She takes issue with the juvenile court's finding that the child could not returned to her at the time of the termination hearing. She also contends the court impermissibly considered

---

[7] Under section 232.116(1)(f), the court may adjudicate parental rights if all of the following are proved by clear and convincing evidence:
> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The court made no findings under paragraphs "d" or "i."

hearsay and ignored the progress she made in the two months before the termination. The mother asserts the State failed to make reasonable efforts to reunify her and the child. Finally, she contends the bond between her and the child should preclude termination.

## II. Scope and Standard of Review.

We review termination-of-parental-rights proceedings de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

## III. Discussion.

> "Our review of termination of parental rights under Iowa Code chapter 232 is a three-step analysis." *In re M.W.*, 876 N.W.2d at 219. First, we must determine "whether any ground for termination under section 232.116(1) has been established." *Id.* If so, we next "determine whether the best-interest framework as laid out in section 232.116(2) supports the termination of parental rights." *Id* at 219–20. If we conclude section 232.116(2) supports termination, "we consider whether any exceptions in section 232.116(3) apply to preclude termination of parental rights." *Id.* at 220.

*In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). It is the State's burden to establish the prerequisites for termination; it is the resisting parent's burden to establish an exception to termination under Iowa Code section 232.116(3). *In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018).

*Hearsay.* The mother argues the juvenile court improperly considered hearsay statements. Iowa's juvenile courts are generally "allowed to make use of hearsay and other evidence that would normally be excluded in our district courts." *In re A.M.*, 856 N.W.2d 365, 373 (Iowa 2014); *accord In re B.H.*, No. 18-1251, 2019 WL 478748, at *2 (Iowa Ct. App. Feb. 6, 2019) (collecting cases). In any event,

because we have not relied on the objected-to statements in our de novo review, reversal is not required.  *See Erickson v. Blake*, No. 15-0251, 2016 WL 1130578, at *1 (Iowa Ct. App. Mar. 23, 2016) ("To the extent any evidence was improperly considered by the district court, reversal is not required given our de novo review of the record on appeal.").

*A ground for termination exists.*  The mother acknowledges the child is four years of age or older, has been adjudicated CINA, and has been out of her custody for more than the statutory period.[8]  *See* Iowa Code § 232.116(1)(f)(1)–(3).  She challenges the court's finding that the child could not be returned to her "at the present time," which means at the time of the termination hearing.  *See id.* § 232.116(f)(4); *D.W.*, 791 N.W.2d at 707.

The mother argues:

> by the time of the TPR trial, L.P. and B.P. were back to having in-person therapy sessions together . . . and they had had their in-person accountability session, and it went exceedingly well according to B.P.'s therapist.  This progress led to B.P.'s therapist recommending progressing to semi-supervised visits before the TPR trial without any safety concerns being reported.  So, essentially, removal of B.P. from L.P.'s home no longer existed at the time of the TPR trial, and B.P. could have been returned to L.P.

The record does not confirm the mother's assertions.

With respect to semi-supervised visits, it is true the therapist testified that "from our perspective, [there was] no reason not to move forward with those."  But it is a stretch to say she "recommended" semi-supervised visits.  Moreover, the therapist explained:

---

[8] B.P. was six at the time of the termination hearing and had been out of the mother's custody for nineteen consecutive months.

Q. So is this accountability session, is that the end of the road and now everything's fine or—A. No.

Q. —what happens?  A. No, this is not everything is fine.  No.  This—I know that [B.P.] was—had a rough week with dysregulation.  I talked to his foster mom yesterday for a long period of time, and I apologized greatly that I hadn't given her more of a heads up about doing that session and him hearing and taking in all the information that he did.  So, no, this is really, truly just the tip of the iceberg.  [B.P.] has a lot of healing to do.

She noted, "We haven't done any work on his past trauma or the relationship with Mom or Dad for that matter."  She stated there was "still additional work that would need to be done between [B.P.] and his mother to heal that relationship."  The therapist expressed concern with the mother's participation in the child's necessary healing: "There's been a lack of insight that I don't know that this is seen as a priority."  The therapist also observed the mother-child interactions were not nurturing.  She explained, there was no eye contact, no touching, no playfulness.  "They are disconnected."  She stated the child's situational limbo had "been just more than he can take."

The social worker supervising the case testified the child could not be returned to the mother's care for many reasons:

I think the first reason is this case has been open for a really, really long time.  Almost three years now.  And only recently has [the mother] beg[u]n to be really engaged in services, and she just had an accountability session, which my conversation with [the therapist] was only touching just the surface level.

The second one is [B.P.] really demonstrates a lot of behaviors, and he has been having behaviors ever since this accountability session on Friday.  Myself and the [guardian ad litem (GAL)] had to go out to the foster home on Wednesday night to help deescalate [B.P.] in which I did have a conversation with [B.P.] and he was able to kind of talk to me—with little how much he does talk—

that Friday was tough for him.[9]  And that his brain just had a lot of cuckoo going on and he just didn't know how to display it and all he could feel was anger.

The social worker summarized, the child needed consistent nurturing and the mother had not demonstrated she could address B.P.'s behavior or meet his emotional needs.

When the social worker was asked why visits moved to semi-supervised, she responded:

[I]t wasn't ideal, but I feel like it was something—it made it pretty black and white in the court order like under the input of therapist and doing that stuff, we would have to move to semi-supervised.  And I don't think [the mother]—in an hour and a half visit—would . . . put [B.P.] at risk like that.

She testified the mother has a great deal of trauma to work through, which "will take a very long time" to address.  She did not believe the mother currently has the patience required to deal with the child's behavior and it was not in the child's best interests to have to wait for his mother to any longer.

We acknowledge the court appointed special advocate did not recommend termination considering the mother's recent progress.  But she admitted she was not familiar with the statutory time frames concerning out-of-home placement.

The statutory time frame for reunification here is twelve months.  This child had been removed from parental custody for nineteen consecutive months at the time of the termination trial.  "Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency."  *In re C.B.*, 611 N.W.2d

---

[9]  She described those behaviors later: "When I came in [after the accountability session], he was kicking, yelling, kicking the door, throwing things in his room, banging on the walls, and yelling every other time."

489, 495 (Iowa 2000). On our de novo review, we find the child could not safely be returned to the mother's custody at the time of the hearing. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) (noting parenting "must be constant, responsible, and reliable"). Consequently, we find clear and convincing evidence supports termination of her parental rights under paragraph "f."

*Reasonable efforts.* "The State must show reasonable efforts as a part of its ultimate proof the child cannot be safely returned to the care of a parent." *C.B.*, 611 N.W.2d at 493. "We have repeatedly emphasized the importance for a parent to object to services early in the process so appropriate changes can be made." *Id.* at 493–94. The mother was granted an extension in July 2021 to seek reunification. Not until February 2022 did the mother complain the State had failed to provide semi-supervised visits as stated in the court's September 2021 review order. This objection is not "early in the process." Additionally, the mother's own delay in attending therapy played a significant role. We, like the juvenile court, determine the State has made reasonable reunification efforts.

*Statutory best interests.* Our next step focuses on the child's best interests. *See* Iowa Code § 232.116(2). We "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *Id.* "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *In re P.L.*, 778 N.W.2d 33, 41 (Iowa 2010).

We find termination of parental rights is in the child's best interests. We adopt the court's conclusion,

> The mother, despite her most recent efforts, has not been able to demonstrate an ability to meet the child's basic or mental health needs over a sustained period of time. It is not in the child's best interests to have him wait any longer for the mother to demonstrate an ability to do so, especially given the length of time he has been out of her care and the significant work still necessary in addressing her own and the child's trauma.

*Permissive exception.* The mother contends her bond with the child countermands termination of her parental rights. *See* Iowa Code § 232.116(3)(c) (providing a discretionary exception to termination when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship"). The mother has not carried her burden to establish the exception, and the record does not show a parent-child relationship so strong that termination will be more detrimental than continuing the child's limbo.

Finding clear and convincing evidence the child could not safely be returned to the mother's custody at the time of the termination hearing, termination of parental rights and an opportunity for permanence is in the child's best interests, and no permissive exception exists to countermand termination, we affirm.

**AFFIRMED.**