# IN THE COURT OF APPEALS OF IOWA

No. 22-0871
Filed August 17, 2022

**IN THE INTEREST OF R.T.,**
**Minor Child,**

**T.T., Father,**
     Appellant,

**C.I., Mother,**
     Appellant.
_____

     Appeal from the Iowa District Court for Lee (South) County, Clinton R. Boddicker, Judge.

     A father and mother separately appeal the termination of their parental rights.  **AFFIRMED ON BOTH APPEALS.**

     Robert J. Reding of Dial & Kuckleman, Keokuk, for appellant father.

     Alan Waples, Burlington, for appellant mother.

     Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

     Kendra Abfalter of State Public Defender's Office, Burlington, attorney and guardian ad litem for minor child.

     Considered by Bower, C.J., and Tabor and Badding, JJ.

**BOWER, Chief Judge.**

A father and mother separately appeal the termination of their parental rights. Both parents challenge the denial of additional time to seek reunification and contend the State failed to make reasonable efforts by not providing more visits after an unsuccessful trial period at home in early 2021. Both parents also contend grounds for termination do not exist and termination is not proper because they are bonded with the child. In addition, the mother claims termination of parental rights is not in the child's best interests, and the father claims the guardian ad litem (GAL) was biased. Because we find clear and convincing evidence to support termination, any further extension of time is unlikely to result in reunification, and termination will best provide the child a chance at long-term stability and permanency, we affirm the termination of both parents' parental rights.

**I. Background Facts and Proceedings.**

The child was born in 2015. Each parent has a history of substance abuse. Methamphetamine is the mother's drug of choice; alcohol is the father's. During a prior child-in-need-of-assistance (CINA) case in 2017, the mother and child were together while the mother participated in residential substance-abuse treatment.

*2019.* The prior CINA case was successfully closed in March 2019. But, in November 2019, a new child-abuse assessment was initiated upon a report the mother was using methamphetamine and a subsequent report that the parents were using methamphetamine and drinking heavily, leaving the child unsupervised. The Iowa Department of Human Services (DHS) again became involved with the family. The mother and child reentered a residential treatment program.

***2020.*** By February 2020, the mother had completed the inpatient portion of treatment, had moved into an apartment with the child, and was participating in intensive outpatient services.

For his part, the father acknowledged his need for alcohol treatment, but insurance issues delayed his admission into inpatient treatment until February 2020. When he was able to enter treatment, he first spent several days in the hospital receiving detoxification services.

A February 14, 2020 case progress report noted the parents had completed treatment before, had remained sober for a time, and had "adequate parenting skills when their skills are not hindered by illegal substances and/or alcohol." The report also noted the parents and child were "strongly bonded."

The father successfully completed the inpatient portion of his substance-abuse treatment and moved into the apartment with the mother and child on March 17.

But, on March 26, the mother reported to DHS that the night before the parents relapsed on alcohol, police had been called to the home several times, the father pushed her, and the father drew images on the child's forehead and bare chest. She asked for assistance. The mother agreed to a safety plan, which included an order prohibiting contact with the father and agreeing no alcohol or illegal substances would be in the home. On April 15, an emergency removal order was filed, and the child was placed in a foster home. A hearing was held on April 23. The court confirmed out-of-home placement was necessary, finding:

> The parents have longstanding substance abuse and alcohol problems, as well as a history of domestic violence issues. There are conflicting stories regarding drug and alcohol use; however, the

child's mother has admitted to relapsing on methamphetamine, and the child's father has admitted to relapsing on alcohol. Both parents acknowledge that a domestic abuse incident occurred between them while the child was present inside the home. Each accuses the other of assault. The court finds that the continued substance use of the parents, coupled with the occurrence of domestic abuse while the child was present in the home constitutes imminent danger to the child's life or health, justifying continued removal. *Both parents need to demonstrate sustained sobriety and stability in order for [the child] to be returned to their home.*

(Emphasis added.) The father was ordered to wear an alcohol-monitoring device to be funded by court-ordered monies. The parents were ordered to have no contact with one another.

An August 31 review ruling summarized:

That since the time of last hearing: [The child] was moved from the foster home due to discovery of another adoptive son having boundary issues of a sexual nature with another child in the foster home. Both parents are reported to be successful and engaged in current treatment. [The father] graduated from both substance abuse and mental health services. Both parents share a desire to reunify individually with [the child] and fear of the other parent having custody and day-to-day care [of the child]. Both parents continue to blame the other for the current removal. [The father] resides with his sister and brother-in-law and is maintaining his sobriety. [He] has often been confrontational with the [DHS] caseworker and service providers and has recently exhibited either impaired or clouded thought processes which have included some paranoid type thinking. [The mother] is now employed but had a relapse with alcohol in May. *Long-term stability and sobriety for both parents continues to be a concern for the court. Both parents need to demonstrate both in order for [the child] to be returned to either of their respective homes.*

(Emphasis added.)

In October, the Foster Care Review Board (Board) issued review reports for each parent, noting a barrier to reunification was each parent's lack of sustained sobriety. The Board also noted "some progress" had been made but that more time was needed to achieve reunification. Concerning the father, the Board also

noted he needed to address mental-health issues, obtain employment, and continue building an appropriate relationship with the child.

For a time, each parent was maintaining sobriety and progressed to semi-supervised and then unsupervised overnight visits.

In December, the Board review reports noted DHS hoped to have the child "home before the next court date."  A December 29 case progress report noted the service provider discussed relapse prevention with both parents and both parents attended inpatient services and NA/AA meetings to help cope with maintaining sobriety.  The report indicated,

> More time and assessment will be needed to see if sobriety will be long term.  Continued utilization of resources and supports will be needed to help further both parents to maintain success.  Both utilize counseling and report that it is helpful.  Both have various supports that they can contact and work with in order to help in various situations.

*2021.*  In January 2021, the mother was also ordered to wear an alcohol-monitoring device with court-ordered funding.  Both parents were maintaining sobriety, and visits were going well.  The child struggled with the parents living separately and their differing parenting styles.

A CINA review hearing was held on February 18.  The court made these findings:

> The child's parents . . . both have a long history of polysubstance abuse and involvement in services.  Both also acknowledge a contentious relationship history.  Fortunately, both parents are presenting as sober and stable.  This period of sustained sobriety on the part of [the father] and [the mother] is a marked improvement over where the parties were one year ago.  [The child] has been attending unsupervised, overnight visits with both parents since October of 2020.  [The mother] remains in her apartment in [XXX] that she secured in February of 2020 following her graduation from treatment.  [The mother] participates in Family Treatment Court . . .

and has had ongoing outpatient services . . . . [She] is full-time employed. [The father] lives with his sister and her husband in [XXX]. [He] continues to visit with [the child] weekly. [The father] continues to wear the [alcohol-monitoring device] and is cooperative with services. For the majority of the case prior to his placement in foster care, [the child] resided primarily with his mother.

The court ordered custody of the child be returned to the mother and granted concurrent jurisdiction to litigate issues of permanent custody and visitation in district court. The parties' prior no-contact order was modified to allow contact for the "limited purpose of discussing matters related to visitation and the child." In addition, the parents were to cooperate with all services recommended by DHS, including random drug screening, family centered services, family team meetings, ongoing mental-health and substance-abuse services, and AA/NA meetings. The father's motion to remove his alcohol-monitoring device was granted shortly after.

Unfortunately, by March 30, both parents had relapsed, and the State sought a review hearing.

After an April 8 review hearing, the court found:

> That since the time of last hearing: A safety plan was enacted by DHS and [XXX] Police on March 10, 2021, which resulted in the child being placed with his father . . . . This was the result of [the mother] being arrested recently, failing to appropriately supervise the child while he was in her care, and relapsing by huffing dangerous substances. A second safety plan was developed on or about March 26, 2021, when [the father] tested positive for methamphetamine for his adult probation officer. Although the test later was verified to be negative, [the probation officer] testified that [the father] has been avoiding him which leads him to have concerns of substance use. After initially refusing a drug test for DHS, [the father] eventually submitted to a hair stat test which was positive for methamphetamine. DHS Caseworker testified that [the father] has recently shown signs of drug use such as slow speech and slurred words. [He] is also reported to have attended his last scheduled visit with [the child] while under the influence of at least alcohol, which

was noted by [the provider]. [The child] remains in the home of his paternal aunt and uncle in [XXX]. Due to a history of concerns for alcohol use by [the child]'s paternal aunt and uncle, [the father's sister and brother-in-law], the court expressed a desire for the child to be placed again in a foster home, if such a placement could be made with the [former long-term foster family].

The court listed the many services that had been offered to the family, which included inpatient and outpatient substance-abuse treatment for the mother, substance-abuse treatment for the father, FSRP services, prior foster care placement, Parent Partner services, mental-health evaluations, random drug and alcohol testing, AA/NA meetings, alcohol-monitoring devices, Family Treatment Court for the mother, and legal representation.

Shortly after the April hearing, the father was involuntarily committed for mental-health treatment. Police had found the father in his car unconscious. His sister reported he had been huffing, exhibiting strange behaviors, and hallucinating. She did not, however, inform DHS of the father's substance use until after the committal.

In May, the DHS caseworker received threats from the father, and another case worker was assigned.

In June, the mother submitted a urine sample that tested positive for amphetamines, and she re-entered inpatient treatment. She completed inpatient treatment and moved to a half-way house in July.

In early July, the father was arrested after police were called to his sister's home. The officers found the father intoxicated and combative, and he threatened an officer with bodily harm. The father provided a urine sample that tested positive for alcohol in mid-July.

In August, the Board no longer agreed with a goal of reunification and recommended termination of both parents' parental rights.

The DHS caseworker submitted a report to the court, dated September 24, with this insight:

> This worker has received calls from [the father] once getting the case where he was intoxicated, belligerent and called worker "a monster."
>
> A lack of insight/understanding as to what caused DHS involvement and how his actions caused harm to [the child] is a serious problem and constitutes an ongoing threat to the child's safety. If there is no recognition for how his actions were harmful before and no ownership to changing those behaviors, it's highly likely the same actions will happen again.
>
> Due to threats of harm to the previous worker by [the father] case was transferred to this worker at the end of May 2021. This worker met with [the father] for the first-time face to face on [May 24,] 2021 and with [the mother] on [May 25,] 2021.
>
> As this worker has reviewed this case and worked with the family for the past [four] months this worker has found that both parents are very manipulative. [The father] and [the mother] have a substantial history of substance and alcohol abuse with underlying mental health issues. [The father] and [the mother]'s relationship is fraught with domestic violence and spitefulness. [The father] has a distorted view of his role as a loving father all the while having subjected [the child] to unsafe situations and parenting [the child] while he is under the influence of illegal substances and/or alcohol. This is not to say [the father] does not love [the child], he does very much.
>
> When this worker first met [the mother], she denied any history of huffing and minimized her substance abuse history. Since that time after entering [a treatment program] she has been more honest with worker. [She] appears to do very well in treatment but when left to her own devices she relapses. She complied with previous requests to be able to have [the child] placed back in her care and could not maintain sobriety placing [the child] in harm's way. On both occasions after completing treatment, she relapsed within weeks of leaving treatment.
>
> [The child] deserves permanency. He is only six years of age and has already endured much trauma at the hands of his parents who peppered his life with episodes of domestic violence, alcohol, drugs, and neglect. [The child] was not the priority of these parents at any time. Right now, he is the prize in the tug of war of which one can one up the other.

On September 28, the child's GAL asked that the court set a date for a permanency hearing, noting the child "was returned to the physical custody of his mother in February, after three weeks he was removed from the home of his mother and was in the physical custody of relatives before returning to foster care." After the first day of a hearing on the motion, the court issued an order noting the child had been removed from his parents' custody for 518 of 538 days, which "far exceeded" the requirement that a permanency hearing be held within twelve months of removal.[1]

The State filed a petition for termination of parental rights on October 27, alleging termination was appropriate pursuant to Iowa Code section 232.116(1)(f).[2] The termination hearing was scheduled for the same time as the CINA permanency hearing on December 9, but the combined hearing was continued because service of the termination petition had not been completed. The father's sister and brother-in-law were granted leave to intervene.

*2022.* A combined permanency and termination-of-parental-rights hearing began on January 26, resumed on January 27, and was completed on February 10. Both the GAL and DHS recommended termination of parental rights. The court concluded:

---

[1] *See* Iowa Code § 232.104(1)(a)(1) (2021).

[2] Under section 232.116(1)(f), a court may terminate parental rights if all the following are true: (1) the child is four years of age or older, (2) the child has been adjudicated CINA, (3) the child has been removed from the parents' custody for twelve of the last eighteen months, or for the last consecutive twelve months with any trial home placement of less than thirty days, and (4) there is clear and convincing evidence the child cannot be returned to the parent's custody safely at the present time.

[The child] is currently four years of age or older; he was previously adjudicated a [CINA] on January 16, 2020; he has been continuously placed outside of his parents' home since April 14, 2020, save [twenty-one] days with his mother from February 18, 2021, to March 11, 2021, [fifteen] days with his father from March 11, 2021, to March 26, 2021, and [fourteen] days in the [paternal aunt and uncle's] home in their care from March 26, 2021, to April 9, 2021; and he clearly cannot be returned to the care and custody of his parents at this time. [The child] cannot be safely returned to the care and custody of [the mother] because she has not demonstrated, and she moreover readily admits, that she cannot remain sober and parent [the child] simultaneously. Likewise, [the child] cannot be safely returned to the care and custody of [the father] due to his continued use of alcohol, his failure to address his methamphetamine use, his failure and refusal to drug test mere weeks prior to the time of the final hearing in this matter, his non-cooperation with services, his threatening and hostile attitude of his caseworkers and service providers, and his mental health concerns.

The court denied the parents' further extensions of time and found termination of both parents' rights in the child's best interests. The court observed both parents

have made some progress in this case, they are both unwilling or unable to confront their alcohol and/or drug addiction in a way which will ensure long-term sobriety. This is evidenced by the fact that both of them have never been able to make it more than several months at a time before suffering a relapse. As of the date of the commencement of the termination of parental rights hearing in this matter, [the child] has been out of the home of his parents for nearly two years. It is unfair to expect [the child] to wait longer for his parents to affirmatively choose him over their addiction to illegal substances.

The court acknowledged the bond between each parent and the child and observed the parents "obviously love him." Yet, the "constant specter of continued drug use and/or relapse renders their homes an unsafe environment." The juvenile court was unwilling to deny the child a chance for stability and permanency, especially because the child was fully integrated into the pre-adoptive foster family home. The court wrote, "A termination of parental rights allows for permanency

without the ongoing and disruptive threat of his parents coming in and out of his life depending on whether they are clean and sober."

Finally, the court rejected a guardianship with the paternal aunt and her husband, noting the child's young age and expressing concern about the codependent relationship between the father and his sister and the likelihood the sister would return the child to the father.

> In the court's view, the only way to guarantee [the child] a fresh start which is in his best interest is to allow a termination and adoption with a permanent family, and this option far outweighs allowing [the parents] to continue a potential on-again-off-again relationship with him, especially given the gravity and long-term nature of the substance abuse issues which have plagued them both.

**II. Scope and Standard of Review.**

"We review termination of parental rights de novo." *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). We give weight to the trial court's findings of fact, especially when considering the credibility of witnesses, though we are not bound by them. Iowa R. App. P. 6.904(3)(g).

**III. Analysis.**

*A. General principles.* We use a three-step analysis to review the termination of a parent's rights. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). We consider: (1) whether grounds for termination have been established, (2) whether termination is in the child's best interests, and (3) whether we should exercise any of the permissive exceptions to termination. *Id.* at 472–73. Step three permits the court to apply permissive exceptions to forgo termination in certain circumstances. *See* Iowa Code § 232.116(3). Yet, the burden of establishing an exception rests

with the parent. *See A.S.*, 906 N.W.2d at 476. We need not address an unchallenged step of the analysis. *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

*B. Reasonable efforts.* We first address each parent's contention that the State failed to make reasonable efforts toward reunification. Iowa law requires DHS to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." Iowa Code § 232.102(7). "[T]he reasonable efforts requirement is not viewed as a strict substantive requirement of termination. Instead, the scope of the efforts by the DHS to reunify parent and child after removal impacts the burden of proving those elements of termination which require reunification efforts." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000).

The parents assert that DHS's refusal to provide more and unsupervised visits following the failed home trial period shows a lack of reasonable efforts. We cannot agree. These parents have been involved with DHS and were provided numerous services to achieve reunification for many months. After about five months of services, the child was removed from the mother's home because the parents could not maintain sobriety. After more than one year of services, the child was returned to the mother's custody only to be removed from her home within weeks due to her relapse by huffing air duster.

The child was moved per a safety plan to the father, who then tested positive for methamphetamine.[3] The child was then moved per a safety plan to the paternal aunt's home and, after a court hearing, returned to the former foster family's home.

---

[3] The father notes this test was refuted by another test. But at the time, DHS was well within its discretion to make the decision to move the child.

The father, too, had relapsed and was huffing. His sister involuntarily committed him because he was a danger to himself, but she did not inform DHS of his relapse. Testimony shows the child does not do well without structure and consistency. The mother stated she could not maintain sobriety and parent the child. Despite the father's denials, his behavior indicated to both his probation officer and the DHS caseworker that he was not maintaining his sobriety. It was entirely reasonable under the circumstances for DHS to try to stabilize the child's situation and to determine what visitation was reasonable.

*C. Grounds for termination exist.* Here, the court terminated both parents' parental rights pursuant to Iowa Code section 232.116(1)(f), which has incorporated a twelve-month limit for reunification. Under this provision, if a child is four years of age or older, has been adjudicated CINA, has been out of parental custody for twelve of eighteen months, and cannot be returned to parental custody at the time of termination hearing, then termination of parental rights is appropriate. *See* Iowa Code § 232.116(1)(f). Both parents focus on the final factor, whether the child could be returned to them "at the present time." Iowa Code § 232.116(1)(f)(4); *see In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (interpreting "at the present time" to mean at the time of the termination hearing).

While the parents challenge the ground for termination, the mother acknowledged at trial that she was not asking for the child's immediate return. Rather, "Today I'm asking for an extension, and I want the opportunity to be reunified with my child. I'm not asking for him to be placed in my care yet. I want reunification, though." She continued, "I would like to see him reunified slowly back with me. I mean I do not want him ripped out of the [foster family]'s home right

now." She also admitted to DHS that she cannot maintain her sobriety and parent at the same time.

As for the father, his testimony shows he is unable or unwilling to acknowledge the extent of his substance abuse or its effect on the child. His appeal is based on "some success" since the child's trial home period, his claim that he had not used alcohol for six months prior to the termination hearing,[4] his recent employment, and his move to independent housing.

On our de novo review, we find clear and convincing evidence supporting termination of both parents' rights under section 232.116(1)(f). The juvenile court repeatedly informed the parents that long-term stability and sobriety was required to achieve reunification. And while the parents apparently have been able to refrain from substance use for a few months at a time—while involved with juvenile court and criminal court monitoring—each has relapsed on more than one occasion. At the time of the hearing, return to either parent's custody would have placed the child at risk of adjudicatory harm because of unresolved substance abuse.

*D. Further extension of time is not warranted.* The juvenile court may defer termination for a period of six months if it is able to "enumerate the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). But we also note, "[o]nce the limitation period lapses, termination

---

[4] Though his brief then notes he has been clean since September 2021, which was only four months prior to the hearing.

proceedings must be viewed with a sense of urgency." *C.B.*, 611 N.W.2d at 495. This child has been out of parental custody for almost two years. And although each parent made "some progress," that progress is erratic and insufficient to instill confidence either can provide safe and stable parenting in another six months. Especially with respect to the father, we agree with the caseworker's observation:

> A lack of insight/understanding as to what caused DHS involvement and how [the father's] actions caused harm to [the child] is a serious problem and constitutes an ongoing threat to the child's safety. If there is no recognition for how his actions were harmful before and no ownership to changing those behaviors, it's highly likely the same actions will happen again.

*See In re N.F.*, 579 N.W.2d 338, 341 (Iowa Ct. App. 1998) ("[T]he statutory time line must be followed and children should not be forced to wait for their parent to grow up.").

*E. Best interests of the child require termination of parental rights.* Because a ground for termination exists, we must consider whether to terminate the parents' rights. We "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). "Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" *C.B.*, 611 N.W.2d at 495 (citation omitted).

It is true the parents can care for their child—when sober. But each has a long history of substance abuse that has resulted in the inability to provide consistent and stable parenting. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990)

("Children simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable."). "It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." *P.L.*, 778 N.W.2d at 41. The child has waited long enough.

*F. No permissive exception will be applied.* Each parent seeks to avoid termination based on their bond with the child. Section 232.116(3)(c) allows the court to decline to terminate parental rights when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." We acknowledge the parents love their child and the child recognizes and obviously enjoys their company when he sees them. But that bond is challenged by instability and relapse.

The child is also bonded with the foster family and is integrated into that home. *See id.* § 232.116(2)(b). There he experiences consistency and stability. Like the juvenile court, we conclude the parents have not shown their bond with the child outweighs the child's need for permanency and stability.

*G. Alleged conflict.* The father also contends he was "uncomfortable" because the GAL represented the father as an attorney years ago and "took a position which appeared to him to be biased." If the father is alleging a conflict of interest, he waived any such claim by failing to make a timely objection.

We affirm the termination of both parents' parental rights.

**AFFIRMED ON BOTH APPEALS.**