**In the Interest of L.L., a child.**

**J.L., Father, Appellant,**

**State of Iowa, Appellee.**

**No. 89–883.**

Supreme Court of Iowa.

July 18, 1990.

As Corrected Nov. 2, 1990.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Kathrine S. Miller–Todd, Asst. Atty. Gen., for appellee.

Stephen W. Newport, Davenport, for appellant.

Vincent Motto, Davenport, guardian ad litem for child.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO and NEUMAN, JJ.

LAVORATO, Justice.

The father of a four-year-old child appeals from a juvenile court decree that terminated his parental rights. We originally transferred this case to the court of appeals, which reversed the juvenile court's decree. On further review, we now vacate the court of appeals decision and affirm the decree of the juvenile court.

L.L.—the child who is the subject of these proceedings—is the daughter of J.L. and G.R. J.L. is black and G.R. is Caucasian. J.L. and G.R. have never married. G.R. has another daughter—T.R.—who was born on April 3, 1984. J.L. is not T.R.'s natural father.

J.L. is also the father of A.T. J.L. claims to be the father of two other children, but has not been in contact with the children or their mother.

J.L.'s family first came to the attention of the Iowa Department of Human Services in February 1986. At that time an undetermined report of child abuse was filed as to T.R., who was then two years old. The report alleged that T.R. had suffered bruises and abrasions to her face.

Several months later the department initiated in-home services for parenting and budgeting. These services continued until July 1986, when they were suspended because J.L. and G.R. did not get along with the homemaker. The following month, the department assigned a new homemaker to the family.

On August 2, 1986, another child abuse referral was made as to T.R. T.R. had received bruises as a result of a hard spanking administered by J.L. because she had wet her pants. Because of this latest incident, the department filed a child in need of assistance petition. *See* Iowa Code § 232.87 (1987). Following a removal hearing, the juvenile court ordered that T.R. remain in the home. The juvenile court, however, also ordered the department to make daily visits to the home to examine T.R. and L.L. for physical abuse.

In October 1986 the juvenile court—following an adjudication and dispositional hearing—adjudicated T.R. a child in need of assistance because of the physical abuse from J.L. The court, however, allowed T.R. to remain in the home. In addition the court ordered the department to visit the child weekly.

In December 1986 a physical abuse was substantiated with J.L. as the perpetrator and A.T. as the victim. *See, e.g.*, Iowa Code § 232.70, 71. J.L. had backhanded A.T. off the toilet into a wall. As a result of this abuse, A.T. suffered a serious scalp laceration and bruising to the face. J.L. admitted to a police officer that he had caused the injuries. The juvenile court subsequently placed A.T. in foster care.

On May 7, 1987, G.R. suffered an epileptic seizure while she was cooking. T.R. and L.L. were in the home at the time. A fire started in the kitchen, and J.L.—on his way home from work—arrived in time to rescue the three from their smoke-filled apartment.

G.R. has a history of seizures. She has had at least five since L.L.'s birth. All the seizures occurred when G.R. was home alone with the children and usually when she did not take her medication.

On May 8, 1987, the juvenile court removed T.R. and L.L. from the home. The court placed the two in foster care due to a substantial denial of critical care on G.R.'s part. Since then the children have remained in foster care.

After the juvenile court removed the children from the home, the department established a case permanency plan. *See* Iowa Code § 232.102(6) (1987). The plan called for a responsibility list that each parent was to comply with as a condition of regaining custody of L.L.

J.L.'s list required him to do several things. First, he was to complete a substance abuse evaluation and undergo treatment. As a part of his treatment, J.L. was to document total abstinence from alcohol and drugs by attending three Alcoholic's Anonymous (AA) or aftercare meetings per week. He was also required to have a sponsor who would provide feedback about his progress.

Apparently J.L. has had a drug and alcohol problem since his teen-age years. In the late 1970s, J.L. was in a drug treatment facility for thirty days. He was also arrested for delivery of cocaine in 1985 and received one year probation. G.R. has indicated that J.L. used marijuana and cocaine on a regular basis and drank beer excessively throughout their relationship.

Second, J.L. was to undergo a complete psychological evaluation and treatment. The treatment was to center on five of J.L.'s weaknesses: his inability to control his anger, a low frustration tolerance, his inflexibility, his tendency to blame others for his problems, and his need to control people.

Third, J.L. was to complete a domestic violence program and receive a recommendation from his counselor that he no longer posed a threat to his children.

Fourth, J.L. was to complete a suitable parenting program that would focus on helping him to: (1) better understand his child's needs; (2) learn management techniques other than corporal punishment; and (3) build and maintain a relationship with L.L. by visiting her weekly and caring for her during these visitations.

Last, J.L. was to have a place to live that was appropriate, safe, and clean for L.L. He was also to have an adequate income that would provide for his own necessities as well as those of L.L.

At first J.L. was very resistive to the plan requirements. For example, he did not participate in a domestic violence evaluation or treatment, he did not begin alcohol and drug treatment, and he did not visit L.L. as scheduled. During this period, J.L.'s behavior was extremely erratic, and he exhibited an explosive temper. J.L. did not participate regularly in aftercare treatment and he soon returned to his old erratic behavior.

Eventually—in July 1987—J.L. did enter outpatient drug treatment services, which he completed the following month. Although J.L. had agreed to attend AA meetings and aftercare support meetings at least twice a week after his release, he attended only ten such meetings from August 1987 to February 1988.

Toward the end of November 1987 J.L. discontinued his visits with L.L. for two months. It was during this period that J.L. and G.R. ended their relationship.

In March 1988 J.L. had a change of heart and began attending AA meetings regularly. He also secured a sponsor and appeared to be doing well.

During the spring of 1988 J.L.'s attitude continued to improve. Besides participating in AA, J.L. completed a parenting course and had individual counseling. He also participated in a domestic violence program. Directors of these programs gave good reports about J.L.'s progress.

With support from his caseworker and relatives, J.L. appeared to be making progress. During this period J.L. was living with his aunt and uncle. J.L.'s progress was significant enough that the department gradually increased his visitations with L.L. from one hour in the office, to a half day at home, to full days at home, to overnight visitation, to five days at home. It appeared that J.L. would regain custody of L.L. in July 1988.

However, in late June and early July, in the words of the juvenile court, "the bottom fell out." The department discovered that J.L. had not been honest with his caseworker. A social worker arrived early to pick up L.L. and discovered that someone had been smoking "pot" in the home.

J.L.'s aunt acknowledged that someone indeed had been smoking pot. In fact—the aunt reported—J.L. had not been chemically free throughout the time that he had been documenting his AA meetings. She also reported that J.L. had lost his job weeks before and that he was not spending time with L.L. during extended visitation.

In a telephone conversation with J.L.'s aunt, J.L.'s caseworker discovered that J.L. had returned from AA meetings with quarts of beer in his hand; that he did not promptly return from AA meetings which he attended during L.L.'s visitation; that on one occasion J.L. had said that he was going to a domestic violence appointment,

but his car was seen at G.R.'s apartment instead; that because J.L. was gone most of the time, his aunt was providing primary care for L.L.; that J.L. had returned to his former group of friends, many of whom had drug and alcohol problems; and that J.L. had not worked in the previous two months because he quit his job.

When his caseworker confronted J.L. with his aunt's statements, J.L. did not deny them. He freely admitted that he was not yet ready to have L.L. placed with him. It was then—for the first time—that J.L. entered inpatient treatment for his alcohol and drug problems. He was released some three weeks later on August 2.

According to his inpatient counselor, J.L. was resistive to treatment for most of his stay. The counselor reported that J.L. did not recognize the need for long-term treatment until the last two days of treatment.

One week later J.L. met with his caseworker. J.L. told his caseworker that he was not responsible for the things that led to his inpatient treatment. J.L. blamed his aunt for his daily marijuana use and blamed his friends for pressing him into drinking again. J.L. minimized his drug and alcohol use and took no responsibility for the extensive time that L.L. had been in foster care. J.L. again admitted that he was not yet able to care for L.L. He then asked that visitation with L.L. be suspended until he could get his life back together.

During this period of time J.L.'s mental health hung in the balance. He demanded readmission to inpatient treatment and threatened to commit suicide. Earlier J.L. had threatened to kill his inpatient counselor because he believed the counselor was responsible for L.L.'s being in foster care. He also threatened two caseworkers.

By October 1988 J.L. stopped visiting L.L. and essentially terminated all in-home services. He had no contact with L.L. until February 1989—some five and one-half months later. During this time Christmas had come and gone, but J.L. sent no presents or a card. Although J.L. called his caseworker to schedule visits with L.L., he did not follow through.

In November 1988 the State filed a petition to terminate the parent-child relationship between L.L. and her parents, G.R. and J.L.

From the end of October through February 1989, J.L. was out of contact with the department. In addition, he failed to document compliance with the permanency case plan—earlier described—from August 1988 until the time of the termination hearing in March 1989.

At the termination hearing J.L. testified he was involved in aftercare during the six months that he had dropped out of sight. As proof he submitted a document of his attendance. The document is suspect because it does not contain the customary telephone numbers of those who attest to his attendance. The document also only gives the first names of those persons, rather than the customary first and last names.

Since July 1988 L.L. and her half-sister, T.R., have been placed with relatives of G.R. These foster parents are potentially adoptive parents. They live in a racially mixed neighborhood, and the children will attend a racially mixed school. L.L. and T.R. appear to have a very close sibling relationship.

Following the termination hearing, the district court terminated the parent-child relationship between L.L. and her parents. J.L. appealed from the termination decree but G.R. did not.

■ I. Child in need of assistance actions are special proceedings requiring a de novo review. *In re D.T.*, 435 N.W.2d 323, 329 (Iowa 1989). We review the facts as well as the law and adjudicate rights anew. We give weight to the fact findings of the juvenile court, especially when considering the credibility of witnesses. But we are not bound by those findings. *In re A.M.S.*, 419 N.W.2d 723, 726 (Iowa 1988).

■ On the question of termination of parental rights, the best interests of the child are our paramount concern. In deciding what is best for the child we look to the child's long-range as well as immediate interests. So we necessarily consider what

the future holds for the child if returned to the parent. In making this decision we look to the parent's past performance because it may indicate the quality of care the parent is capable of providing in the future. *Id.*

The State has the duty to see that every child within its borders receives proper care and treatment. *In re D.T.*, 435 N.W.2d at 329. To that end our statutory termination provisions are preventive as well as remedial. They are designed to prevent probable harm to the child and do not require delay until after harm has occurred. *In re A.M.S.*, 419 N.W.2d at 726. So the statutory presumption that a child's best interest will be served by leaving the child with the child's parent is not conclusive. *See* Iowa Code § 232.1.

II. Iowa Code section 232.116(5)(a), (b), and (c) (1987) sets forth the following conditions for terminating parental rights:

a. The child has been adjudicated a child in need of assistance pursuant to section 232.96; and

b. The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months; and

c. There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102.

J.L. concedes that the first two conditions have been met. He contends, however, that the evidence is less than clear and convincing that L.L. cannot be returned to his custody pursuant to section 232.102.

Section 232.102(4)(b) pertinently provides that

[w]henever possible the court should permit the child to remain at home with the child's parent.... Custody of the child should not be transferred unless the court finds there is clear and convincing evidence that:

....

b. The child cannot be protected from some harm which would justify the

adjudication of the child as a child in need of assistance....

Clearly, then, the requirement of section 232.102(4)(b) is met when the child cannot be returned to the parental home because the definitional grounds of a child in need of assistance exist. *In re A.M.S.*, 419 N.W.2d at 725. The pertinent definitional grounds here are found in Iowa Code section 232.2(6)(b) and (c)(2):

"Child in need of assistance" means an unmarried child:

....

b. Whose parent ... has ... neglected the child, or is imminently likely to abuse or neglect the child.

c. Who has suffered or is imminently likely to suffer harmful effects as a result of:

....

(2) The failure of the child's parent ... to exercise a reasonable degree of care in supervising the child.

Our examination of the record convinces us that the State proved all three definitional grounds in section 232.2(6)(b) and (c)(2).

We give J.L. no plaudits for his past performance. His physical discipline of two other children in his home led to physical injuries and shows his propensity for violence. Although J.L. underwent domestic violence treatment, his propensity for violence was still evident after his treatment. As late as August 1988 he was threatening suicide and physical harm to others.

It is clear to us that J.L.'s long history of alcohol and drug abuse is the root of his problems. Such abuse has made him susceptible to violence, made it difficult for him to retain jobs, and has caused him to neglect L.L. at times.

Although J.L. has completed several outpatient and inpatient programs, he has not overcome his alcohol and drug abuse. He has been resistive to any treatment and has consistently failed to be seriously involved with aftercare. Although J.L. produced documentation showing his involvement

with aftercare from August 1988 until the termination hearing, we—like the district court—find the documentation not credible.

When the department gave J.L. opportunities to parent L.L., he passed the responsibility onto his aunt. His visitation with L.L. was less than regular. Such visitation can be characterized as inconsistent and sporadic. At one point—from August 1988 to February 1989—he failed to visit L.L. at all. Such failure comes dangerously close to abandonment.

What is clear in this record is J.L.'s lack of maturity, maturity so necessary to be a responsible, effective, and competent parent. By his own admission on two occasions, J.L. was not capable of parenting L.L. In addition, he asked for a moratorium on visitation "until he could get his life back together." Children simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable.

Equally clear is J.L.'s lack of motivation to change. At times he appeared to take the steps necessary to regain custody of J.L. For example he complied with a parenting program, a domestic violence program, and several inpatient and outpatient drug and alcohol programs. Yet, after each, he reverted to his old ways.

Several other facts favor termination here. One concerns the length of time L.L. has been in foster care. At the time of the termination hearing L.L. was four. Three of these four years had been spent in foster care. On this point we have been emphatic:

It is unnecessary to take from the children's future any more than is demanded by statute. Stated otherwise, plans which extend the twelve-month period during which parents attempt to become adequate in parenting skills should be viewed with a sense of urgency. Of course some suggested extensions will prove to be appropriate. The judge considering them should however constantly bear in mind that, if the plan fails, all extended time must be subtracted from an already shortened life for the children in a better home.

*In re A.C.*, 415 N.W.2d 609, 614 (Iowa 1987).

The department has provided J.L. with services and given him time to develop parenting skills and to overcome his problems. J.L. is clearly several years beyond the time the legislature felt was necessary to develop these skills. Yet he has failed to show much improvement. Given J.L.'s past performance we are not convinced additional time or services will change him.

Another fact favoring termination has been L.L.'s experience in her foster home. Iowa Code section 232.116(2) speaks to this:

In considering whether to terminate the rights of a parent under this section, the court shall give primary consideration to the physical, mental, and emotional condition and needs of the child. Such consideration may include any of the following:

. . . .

b. For a child who has been placed in foster family care by a court ... whether the foster family is able and willing to permanently integrate the child into the foster family. In considering integration into a foster family, the court shall review the following:

(1) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining that environment and continuity for the child.

At the time of the termination hearing L.L. had been living with relative-foster parents for almost a year. The foster parents are relatives of L.L.'s natural mother. A home study which is in evidence gave this glowing report of the foster parents:

The [foster parents] are genuine, honest, open and loving people. They adore both children and cannot imagine life without either one of them. T.R. and L.L. have bloomed in their care. Almost everyone who comes into contact with these two have commented on the difference in their demeanor since placement in the home.

The department thought so highly of the foster parents that it recommended to the court that L.L. be adopted by them in the event the court terminated parental rights.

In light of this evidence it seems clear to us that L.L. has become integrated into the foster family to the extent that L.L.'s identity is with the foster family. It seems equally clear that the foster parents are able and willing to permanently integrate L.L. into the foster family. Given these conditions we think it would be a mistake to disturb the stability L.L. seems now to be enjoying.

Finally, we view the bond between L.L. and T.R. as yet another fact favoring termination. See In re Wardle, 207 N.W.2d 554, 565 (Iowa 1973) (siblings should not be separated and lose the benefit of constant association with one another except when the circumstances require it). A home study completed in October 1988, which also is in evidence, describes the bond this way:

> [T.R.], age four and one-half years and [L.L.], age two and one-half are two sisters who have a very close relationship. It is quite clear they love one another deeply. It is fair to say that [T.R.] cannot imagine life without [L.L.]. For example, earlier this year [L.L.] was visiting with her father while [T.R.] was visiting with her current foster family. When [T.R.] returned home she would look for her sister and become upset and sullen if she could not find her. At times she would not participate in any activities and would just sit and wait for [L.L.]. Upon L.L.'s return to the foster home, [T.R.] as well as [L.L.] would break into gestures of affection for the other. The same is true for [L.L.]. [L.L.] is never but a few steps behind [T.R.] in any play activity. With [T.R.'s] participation in preschool three half-days a week, [L.L.] has learned [T.R.] will not always be with her. However, [L.L.] anxiously awaits [T.R.'s] arrival home. There is no mistaking the immense bond between these two children. Together they are virtually inseparable.

We think the following passage from the juvenile court's termination decree accurately sums up this case:

> [L.L.] needs a father who is consistently and continually committed to her and not one who is vacillating in his commitment to her or in a continual struggle to resolve his own problems such that he cannot address hers.

> [L.L.] is almost three years old and has been in an out-of-home placement most of her life. She cannot afford to wait longer for her father to decide whether or not he wants to be her parent. [J.L.] perceives that he has no changes to make and projects to the professionals for his problems. He has not significantly progressed according to the case plan, and after more than three years of intervention, the court concludes that he has no better capability of parenting this child or even understanding this child's needs and problems. Nor does the parent understand his obligations and responsibilities, nor does the parent understand the effect his lifestyle has on his child.

■ III. Because it seems likely that L.L.'s foster parents will adopt her, we address J.L.'s contention that L.L. will lose her racial identity if his parental rights are terminated. He argues this should militate against termination of his parental rights.

J.L.'s mother, who has educational and job experience in social work, testified as an expert on this point. The expert testified that L.L. may need her racial identity to sustain her in her adult years when—in the expert's words—"white society in general rejects her." For this reason, J.L.'s mother opined that termination of J.L.'s parental rights would not be in L.L.'s best interest.

We too agree that L.L. should retain her racial identity to the extent that she can. Experts in the field agree that children may suffer when their biological ties are cut off by termination of parental rights. See Beyer & Meynier, Lifelines to Biological Parents: Their Effect on Termination of Parental Rights and Permanence, 20 Fam.L.J. 233, 237 (1986).

But we are not prepared to say this factor should outweigh all the other factors we must consider on the question of termination. It is one of many. And it so happens in this case that the other factors weigh more heavily in favor of termination.

Fortunately the foster parents are likewise sensitive to this issue. They live in a racially mixed neighborhood, and L.L. will attend a racially mixed school.

Finally, we are troubled by the expert's premise that white society will reject L.L. in her adult years. To be sure, racial prejudice has stained many past pages in the history of our culture, and we have sympathy for the witness's skepticism concerning society's hope that such matters can be consigned to the past. We nevertheless cannot submit to such a premise, and we refuse on such a basis to condemn this child to continue in what has been demonstrated to be an intolerable relationship.

IV. J.L. raises one additional issue. He asserts the State's failure to return L.L. was racially motivated.

We have carefully examined the record and conclude there is no basis for this assertion. The department was ready to reunite J.L. and L.L. when it discovered J.L. was not being truthful about his compliance with the case plan. The decision to reunite was made even though such reunification would have separated T.R. and L.L.

The record is clear that the department was patient with J.L. and probably gave him more margin for error than he was entitled to. We have detailed all the facts which support termination. They are many. And they belie any assertion that the department was racially motivated.

V. In summary we conclude there is clear and convincing evidence that L.L. cannot be returned to J.L.'s custody. So the juvenile court was correct in terminating J.L.'s parental rights.

We vacate the court of appeals decision and affirm the decree of the juvenile court.

DECISION OF COURT OF APPEALS VACATED; DECREE OF THE JUVENILE COURT AFFIRMED.