D.G. Jr. (Jr.) appeals the termination of his parental rights to his son, D.G. III (D.G.), contending the statutory requirements for termination have not been met. We affirm.
I. Background Facts and Proceedings.
D.G. was born in May 2004 and began living with his paternal aunt, Alycia, and her children, in 2006, [1] shortly after Jr. learned he was the child's father. D.G.'s mother voluntarily allowed Alycia to take D.G. into her care. An order of the probate court named Alycia as legal guardian in January 2007.
D.G. came to Alycia with developmental delays with respect to his speech and play. In December 2007, Alycia began taking him to child therapist, Rebecca Robinett. D.G. continued to see Ms. Robinett throughout these proceedings.
D.G. was adjudicated a child in need of assistance (CINA) in September 2008.[2] Although the record does not contain much information about Jr.'s involvement with D.G. during the first four years of his life, it appears that he had been content to leave the child's care with his sister, Alycia. Jr. reportedly provided no financial support for the child, although there is one reference noting he was regularly employed. Jr. sought no services in relation to the CINA proceedings until April 2009, when he attended a family team meeting.
An April 30, 2009 report to the court of the guardian ad litem (GAL) states:
 [D.G.] sees his father [Jr.] frequently but not consistently. Jr. resides across the street from [Jr.] and Alycia's mother. Alycia frequently visits her mother and during those visits [D.G.] sees his father. While the undersigned does not believe that [Jr.] is a threat to [D.G.], the undersigned believes that [Jr.] has consistently failed to step up to the plate, so to speak, when it comes to parenting [D.G.]. [Jr.] is content in allowing Alycia to handle all of [D.G.]'s needs. While the undersigned is sure that Alycia would like a break from time to time, [Jr.] does not offer to provide these much needed breaks for Alycia. Yet — [Jr.] has insisted that he does not want his parental rights terminated and that he someday hopes to regain custody of [D.G.] The actions of [Jr.] are contrary to his statements. Meanwhile, Alycia provides for all of [D.G.]'s needs without complaint and treats [D.G.] no differently than her own biological children. . . .
 . . . .
 Based on the above-mentioned reasons the undersigned agrees with the recommendations set forth in the Case Permanency Plan. The undersigned further believes that [D.G.] should remain in the custody, care and control of his guardian. . . . The undersigned believes that any visitation between [D.G.] and [Jr.] should be at the discretion of [Alycia] and that [Jr.] must begin participating in therapy sessions and parenting classes.
In a June 30, 2009 report, the GAL noted D.G. was having "increased visits with his father," but they "continue to be inconsistent." The GAL expressed concern about the effect of the inconsistency on D.G. She also noted that Jr. had "begun participating in [D.G.]'s therapy sessions with Becca Robinette" and noted that Alycia hoped that the sessions would have a positive impact on D.G.
The June 30, 2009 review order continued D.G.'s placement with Alycia "subject to [Department of Human Services] DHS supervision and further review by the Court." A permanency hearing was set for August 10, 2009.
On August 10, 2009, the State filed a petition to terminate parental rights. The permanency hearing was continued and was to be held with the termination hearing on August 27, 2009. At the termination hearing, the parties agreed to proceed based upon the admitted exhibits, written record, and stipulation that Ms. Robinett supported termination of parental rights of both parents, that she had considered the issue of a long-term guardianship with Alycia rather than termination, and that she did not believe the guardianship would be in D.G.'s best interests. Jr. did not testify and the exhibits contain little information about him, his residence, health, history, work schedule, education, or plans for the future. The single most telling piece of information about Jr. and his care of D.G. is the description of the changes in D.G.'s behavior following a short period of time during which Jr. provided unsupervised care for the child.
Exhibits on file include a report to the court by Andrea Jones, DHS social worker. Ms. Jones stated that on a July 23, 2009 visit with D.G. and his siblings, she learned that D.G. was living with his father and that the "situation was done without any input from DHS or [D.G.]'s GAL." She reported that she observed "extreme behaviors at the visit" and learned from another service provider that D.G.'s behavior "went downhill" after the June 30 review hearing. Ms. Jones reported that D.G. "struggles when his routine or structure changes without warning; this was evident by the changes in his behavior when he was living with his father." Ms. Jones expressed concern that Jr. lacked insight into the needs of his son and "seems to act on what is best for [Jr.] instead of what is best for his son."
Two writings by Ms. Robinett are in evidence. Ms. Robinett's June 22, 2009 report to the court was quite favorable toward Jr., in which she states:
 [D.G.] demonstrates that he feels safe to express a full range of emotions in both Alycia's and his father's presence. [Jr.] has created a number of age appropriate rules and expectations for
 [D.G.] to follow when they spend time together and we have been able to process how they are negotiating these rules during their time together.
In a July 28, 2009 letter to DHS, Ms. Robinett noted that in early July D.G. began "spending the majority of his time with his father including overnights," a situation Ms. Robinett "assumed . . . was a court approved change." She noted that D.G.'s behavior and mood changed in her July sessions with him. She described D.G. as "irritable," "aloof," and "defiant." Ms. Robinett had spoken with Alycia, who shared concerns expressed by D.G.'s teacher as to recent changes in D.G.'s behavior. Ms. Robinett noted that she learned on July 24 that the change in D.G.'s care had not been approved by the court and was done without DHS involvement or awareness. She indicated that D.G. was returned to Alycia's custody. In this letter, Ms. Robinett made the following recommendations:
 I believe it remains in [D.G.]'s best interest to remain in [Alycia's] custody, with frequent, predictable contact with his father. I recommend that [D.G.] and his father have three routine weekly visits as suggested by DHS. Their visits should increase in duration and frequency gradually, as long as [D.G.]'s behavior remains consistent. A change in behavior could indicate that he is struggling too much with the adjustment and because of his young age, he lacks the ability to articulate his needs.
 It is difficult to make a recommendation regarding permanency for [D.G.] as it relates to his father. [Jr.] intends and has shown the ability to provide care for [D.G.] as he has demonstrated over the past few weeks. However, based on a lengthy history of his inconsistent involvement with [D.G.]'s routine care prior to the past few months, it is difficult to predict if he is prepared to manage this responsibility long term, as this change occurred only after consideration of impending termination of rights.
As noted above, the parties stipulated that, at the time of the August 27 hearing, Ms. Robinett recommended termination.
The court ordered Jr.'s parental rights be terminated pursuant to Iowa Code subsections 232.116(1)(d) (child adjudicated CINA, parents offered services, and circumstance continues despite services) and (f) (child over four years of age, adjudicated CINA, out of parent's custody twelve of last eighteen months, and cannot be returned to parent's custody) (2009).
With respect to Jr., the court found:
 Jr. recently ramped up his efforts to demonstrate that he could be a viable option for [D.G.]. The classic phrase too little, too late comes to mind. [Jr.] would need a significant amount of time to demonstrate that he is in his son's life for the long haul. The recent disruption in his placement resulted in the degradation of D.G.'s behavior. That this seismic shift for [D.G.] was undertaken without the knowledge and blessing of the professionals in the case demonstrates, on [Jr.'s] part, a real lack of sensitivity to his son's well being.
The court also concluded that even though it need not terminate parental rights when a child is in a relative placement, D.G. was in need of permanency. He had lived with Alycia more than half of his life and she had "done an exemplary job of addressing [D.G.]'s special needs." Because neither of his parents was "in a position to provide him with a safe, stable, and permanent home," the court found it in his best interests to terminate parental rights.
Jr. now appeals.
II. Scope and Standard of Review.
 We review termination proceedings de novo. Although we are not bound by them, we give weight to the trial court's findings of fact, especially when considering credibility of witnesses. The primary interest in termination proceedings is the best interests of the child. To support the termination of parental rights, the State must establish the grounds for termination under Iowa Code section 232.116 by clear and convincing evidence.
In re C.B., 611 N.W.2d 489, 492 (Iowa 2000) (citations omitted).
III. Discussion.
Jr. claims the juvenile court erred in finding there was clear and convincing evidence to support termination of his parental rights under either section 232.116(1)(d) or 232.116(f) and in concluding that termination was in D.G.'s best interests.
Because we conclude termination of Jr.'s parental rights was proper under section 232.116(1)(f) (child over four years of age, adjudicated CINA, out of parent's custody twelve of last eighteen months, and cannot be returned to parent's custody), we need not and do not address his claim regarding section 232.116(1)(d). See In re S.R., 600 N.W.2d 63, 64
(Iowa Ct. App. 1999) ("When the juvenile court terminates parental rights on more than one statutory ground, we need only find grounds to terminate under one of the sections cited by the juvenile court to affirm."). As the first three elements of section 232.116(1)(f) are clearly met, Jr.'s claim implicates only the fourth element of that section. This element is proved when the evidence shows the child cannot be returned to the parent without remaining CINA. In re R.R.K.,544 N.W.2d 274, 277 (Iowa Ct. App. 1995). The threat of probable harm will justify termination of parental rights, and the perceived harm need not be the one that supported the child's removal from the home. In re M.M., 483 N.W.2d 812, 814 (Iowa 1992).
Jr. argues the State "provided no evidence that the placement with the father would be harmful to the child's emotional and mental well being." However, Jr.'s own conduct provides the evidence. The unauthorized change in D.G.'s care and its adverse consequences to D.G.'s behavior supports a finding that placement with Jr. would be harmful.
Our primary concern is the child's best interests. "In this connection, we look to the child's long-range as well as immediate interests. Hence we necessarily consider what the future likely holds for the child if returned to his or her parents." In re Dameron, 306 N.W.2d 743, 745 (Iowa 1981) (stating evidence of a parent's past performance may be indicative of the quality of the future care that parent is capable of providing).
Our de novo review reveals that Jr.'s overall progress in this case was — as found by the court — "too little, too late." As our court has often stated, a parent does not have unlimited time in which to correct his deficiencies. In reH.L.B.R., 567 N.W.2d 675, 677 (Iowa Ct. App. 1997). "Children simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable." In re L.L.,459 N.W.2d 489, 495 (Iowa 1990). D.G. needs permanency. We conclude that termination is in D.G.'s best interests.
AFFIRMED.
[1] The record is not entirely clear when D.G. first started living with Alycia. However, Alycia informed social worker Rebecca Robinett that Jr. learned he was D.G.'s father when D.G. was about eighteen months old and it was then that Alycia approached D.G.'s mother about meeting D.G. Alycia stated that the mother allowed D.G. to go with her and stay overnight even though the mother did not know Alycia.
[2] The adjudication resulted from D.G.'s sibling having been sexually abused by a man in the mother's house and concerns for D.G.'s unsupervised visits with the mother.