**IN THE COURT OF APPEALS OF IOWA**

No. 24-0327
Filed April 24, 2024

**IN THE INTEREST OF O.K., N.K., and A.K.,**
**Minor Children,**

**M.A., Mother,**
        Appellant,

**G.K., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Susan Cox, Judge.


        A father and a mother each appeal the termination of their parental rights.

**AFFIRMED ON BOTH APPEALS.**


        Shireen L. Carter, Des Moines, for appellant mother.

        Gina E.V. Burress of Carr Law Firm, P.L.C., Des Moines, for appellant

father.

        Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney

General, for appellee State.

        Tonya A. Oetken of Oetken Law Firm, Inc., Ankeny, attorney for minor child

A.K.

        Barbara Davis, West Des Moines, attorney for minor children N.K. and O.K.

and guardian ad litem for minor children A.K., N.K., and O.K.

        Considered by Tabor, P.J., and Greer and Schumacher, JJ.

**TABOR, Presiding Judge.**

This case involves three children: sixteen-year-old A.K, twelve-year-old N.K., and four-year-old O.K. George is the father of all three. Melissa is the mother of the older two. George and Melissa each appeal a juvenile court order terminating their parental rights.[1] George challenges the statutory grounds and argues that termination is not in the children's best interests. Melissa also raises a best-interests claim, invokes the exception for a child over ten who objects to termination, and lobbies for a guardianship. Finding no merit to the parents' claims, we affirm the order in both appeals.[2]

## I. Facts and Prior Proceedings

George and Melissa were married in 2003 and had three children together, including A.K. and N.K. (Their older son, Z.K., is now over eighteen and not a party to this appeal.) They separated in 2019, according to a case history drafted by the Iowa Department of Health and Human Services.[3] After separating from Melissa, George and the children lived with Stephanie. George and Stephanie had one child together, O.K., born in 2020.

The department became involved with the family in April 2022. A.K. told social workers that Stephanie was drinking alcohol to the point of passing out while caring for O.K., leaving the older children to mind the toddler. A.K. also said

---

[1] The juvenile court also terminated the parental rights of O.K.'s mother, Stephanie, who does not appeal.

[2] We review termination-of-parental-rights proceedings de novo. *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014). In doing so, we assess both the facts and the law, and we adjudicate rights anew. *Id.* As always, our core concern is the children's best interests. *Id.*

[3] In his psychosexual evaluation, George reported that he married Melissa in 2001 and they divorced in 2017 or 2018.

Stephanie had anger issues. Likewise, N.K. expressed concern that Stephanie was physically violent toward his sister A.K. The children said their father knew what was going on and did nothing about it. They also reported that their uncle and grandfather were staying with them and using illicit drugs in the house. The juvenile court adjudicated Z.K., A.K., N.K., and O.K. as children in need of assistance in July 2022.

After that adjudication, the older children lived with their mother, Melissa. O.K. stayed with her father, George. But those placements did not work out. In August, Melissa allowed an "unsafe man" into her home who provided Z.K. with alcohol and marijuana. Beyond that, she did not fill the children's prescriptions. And on top of everything, she was evicted and homeless before securing emergency housing. Because of Melissa's instability, A.K. and N.K. moved in with other relatives.

In December, the juvenile court removed O.K. from her father's care because he was not following the department's safety plan. A few months later, concerns arose about George's interactions with O.K. In February 2023, O.K. told Emily, her family placement, that "daddy George spanks me" and "gives me owies." O.K. was afraid to go to church if her father would be there. About a month later, Emily was changing her diaper when O.K. "stuck her finger inside her private area and started saying 'daddy George cuts me in there.'" After a visit, O.K. rejected George's request for a goodbye kiss and started crying hysterically when he kissed her anyway. Concerned about these incidents, Emily took O.K. to therapy in April 2023. After ten "discovery work" sessions, therapist Keifer Nevius

noted that O.K. withdrew from sensitive topics but some of her statements and behavior showed a "perceived fear of abuse."

At a permanency hearing in May 2023, George confronted the department's concerns that he had sexually abused O.K. He denied doing so, suggesting that the child may have been recalling times when he applied cream to her diaper rash. In his testimony, he took some responsibility for subjecting the older children to Stephanie's abuse, but also minimized its impact. The juvenile court summarized George's explanations for two other accusations:

> He denied throwing [N.K.] out of a moving car, but acknowledged threatening to throw him out of the car if he did not put on his seat belt. He denied threatening to cut off [A.K.'s] fingers with garden shears but acknowledged telling her a story [about] how people in Middle East were punished for stealing—he had a pair of shears with him.

The court did not find George's testimony credible—describing his narrative as "self-absorbed and self-centered." In its permanency order, the court directed George to obtain a psychosexual evaluation. He did. That evaluation recommended that George not have any contact with O.K. until the accusations of sexual abuse were "resolved." As for the older children, they refused to visit their father after the permanency hearing.

In August 2023, the State petitioned for termination of parental rights. At the October termination trial, the court heard testimony from both parents. Melissa testified that she was living in a group home and "trying to get back on her feet." She was receiving help with medication management for her depression, anxiety, and PTSD. She acknowledged it could be as long as a year before she could

provide a safe home for A.K. and N.K. She asked the court to consider creating a guardianship for the children rather than terminating her parental rights.

By contrast, George testified that he was ready to resume custody of the children. He said he ended his relationship with Stephanie, recognizing it was unhealthy. He discussed his therapy sessions, noting that he was trying to "deal with his own traumas" so he could "get a better feel for what the kids have gone through." He chronicled the abuse he had suffered as a child. George also discussed O.K.'s allegations of abuse, this time suggesting that her trauma related to having a doctor put in a catheter during a hospital stay.

Counselor Nevius testified that O.K. had never mentioned that hospital stay. But during their sessions, she did discuss having nightmares, "cutting," and "hurting down there." Because Nevius could not pinpoint the source of O.K.'s trauma, he did not make a mandatory report to the department or law enforcement. But Nevius did express "extreme concern that [O.K.'s] living status remain as stable as possible."

The court also heard from Anna Hendrickson, the mental-health counselor for A.K. and N.K. Hendrickson reported seeing "a lot of growth from both of them" as they settled into a more "stable and supportive lifestyle." N.K. worried about his mother when she was homeless but felt relief when she moved into a group home. Both children showed a decreased interest in visiting either parent. At the time of the permanency hearing, both children expressed a preference to live with their mother. But recently they told Hendrikson that "they would prefer to stay with their current placement." The counselor did not believe that a guardianship would be a good option for the children: "[T]he kids will always have that cloud of 'what if'

floating over their head. It will prevent them from continuing to grow and enjoy life as is going forward."

The father's therapist, Julie Butler, testified that he was making progress by focusing more on accountability. But the juvenile court placed little stock in her testimony, finding that George had "repeatedly lied" to the therapist about critical information. For instance, George did not share the results of his psychosexual evaluation with his therapist.

The juvenile court granted the State's petition, relying on Iowa Code section 232.116(1) (2023), paragraph (h) to terminate George's parental rights to O.K. The court relied on paragraph (f) to terminate the rights of George and Melissa to N.K. and A.K. The court also concluded that terminating parental rights was less detrimental to these children than continuing the parent-child relationships. Both parents challenge the termination order.

## II.    Analysis

We will address the issues raised by each parent in turn.

### A. George's Appeal

The father first contends that the State failed to prove by clear and convincing evidence that the children could not be safely returned to his custody. *See* Iowa Code § 232.116(1)(f)(4), (h)(4).[4] He highlights his negative drug tests and his participation in therapy to address his own adverse childhood experiences. He next argues that termination is not in the children's best interests because it

---

[4] George concedes that the State satisfied the other three elements of these provisions: the children were adjudicated CINA; they were the requisite age; and they had been removed for the time designated in the statute.

severs the parent-child bond.[5]  He points to the "extended period" in which he cared for O.K. and emphasizes that she "recognizes the father."

The State counters that the father has not rebuilt a relationship with his children since removal.  In fact, their relationships have become more strained since allegations surfaced that he sexually abused O.K.

The juvenile court aptly described why the father could not resume custody:

> [H]e allowed violence to occur in their home.  He has failed to truthfully participate in services, including the psycho sexual evaluation.  He remains unsafe to parent.  Since contact with the father has stopped, the children have improved.  None of the children are asking to see the father.

After our de novo review, we reach the same conclusion as the juvenile court.  George did not show a protective capacity when the children were being abused and neglected by Stephanie.  He also allowed family members to use illicit drugs in their home.  And he contributed to the unhealthy environment by threatening the children with physical harm.  Finally, the juvenile court was naturally concerned with O.K.'s disturbing allegations of sexual abuse and did not find George's shifting explanations credible.  On this record, we find clear and convincing evidence that the children cannot safely return to his custody.  *In re H.R.K.*, 433 N.W.2d 46, 50 (Iowa Ct. App. 1988) ("Sexual abuse allegations aside, the record contains ample evidence in support of the court's termination order

---

[5] The father's petition on appeal conflates the framework for deciding what is in a child's best interests in section 232.116(2) with the exception to termination in section 232.116(3)(c).  While this briefing mistake is common, it muddles the burdens of proof.  It is the State's burden to prove termination is in the children's best interests.  *See In re R.P.*, No. 23-0419, 2023 WL 3612412, at *2 (Iowa Ct. App. May 24, 2023).  By contrast, our supreme court has held that the burden shifts to the parent resisting termination to prove that one of the exceptions in subsection (3) applies.  *In re W.T.*, 967 N.W.2d 315, 322 (Iowa 2021).

there is clear and convincing evidence that the children were physically abused and neglected."). What's more, the record belies the father's claim that the juvenile court should have preserved his parental rights because of their bond.

### B. Melissa's Appeal

The mother does not contest the statutory grounds for termination, recognizing that she is unable to resume custody of A.K. and N.K. But she does argue that termination is not in their best interests. *See* Iowa Code § 232.116(2). She also seeks an exception to termination based on A.K.'s objection. *See id.* § 232.116(3)(b). Finally, she contends that creating a guardianship with the current placement would be better than terminating her parental rights.

We first address the children's best interests. In doing so, we consider their safety; the best placement for furthering their long-term nurturing and growth; and their physical, mental, and emotional condition and needs. *Id.* § 232.116(2). Applying that framework, we conclude termination of Melissa's parental rights promotes the best interests of A.K. and N.K. They no doubt love their mother and wish the best for her. But their counselor believed that minimizing contact with Melissa would reduce their persistent fretting about her. Melissa argues counselor Hendrickson's opinion is too speculative. We disagree. The children have already shown that greater stability frees them to enjoy normal adolescent pursuits. For instance, A.K. went to her first homecoming dance. And N.K. is less stressed about his mother and more involved with his placement family. Waiting for their mother to "get back on her feet" is not in their best interests. *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Parenting . . . must be constant, responsible, and reliable.").

Melissa next contends "there was testimony during the termination of parental rights proceedings that A.K., who was 16 years old, did not want her mother's parental rights terminated." From our reading, the evidence on A.K.'s objection was not that clear-cut. Social worker Monica Kordick testified that A.K. told her that she understands the situation and "her first wish would be Mom, but if that can't happen, if it goes to termination, she would want to be adopted by the placement she's at now." Meanwhile, counselor Hendrickson testified that since the permanency hearing, A.K. expressed a preference to stay with her current placement. But even if the record reveals A.K.'s opposition, we agree with the juvenile court's conclusion that the child-objection factor in section 232.116(3)(b) should not preclude termination here. What a child wants is not always in her best interests. *See In re A.R.*, 932 N.W.2d 588, 592 (Iowa Ct. App. 2019). Given Melissa's instability, it was not advisable for the juvenile court to honor A.K.'s desire to preserve her mother's parental rights. *See id.*

In that same vein, we reject Melissa's request for a guardianship. Our supreme court has consistently advised that guardianships are not "legally preferable" alternatives to terminating parental rights. *In re W.M.*, 957 N.W.2d 305, 315 (Iowa 2021) (citation omitted). And that is true here. We are persuaded by the views of the children's therapist that the "what-ifs" of living under a guardianship would extend the uncertainty they have endured during the CINA case. Although a loss for the children, termination of Melissa's parental rights will provide them with more permanency and stability.

**AFFIRMED ON BOTH APPEALS.**