**IN THE COURT OF APPEALS OF IOWA**

No. 25-1123
Filed September 17, 2025

**IN THE INTEREST OF A.N. and A.D.,**
**Minor Children,**

**A.D., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Scott County, Michael Motto, Judge.

A mother appeals a permanency review order transferring guardianship of her two children to their paternal grandmother. **AFFIRMED.**

Gina L. Kramer of Kramer Law Office, PLLC, Dubuque, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Jean Capdevila, Davenport, attorney and guardian ad litem for minor children.

Considered without oral argument by Schumacher, P.J., and Badding and Langholz, JJ.

**BADDING, Judge.**

This appeal concerns two of the mother's children—A.N., born in 2020 and A.D., born in 2021—who have been involved with the Iowa Department of Health and Human Services for most of their young lives. The juvenile court closed their prolonged child-in-need-of-assistance proceeding by transferring guardianship to the paternal grandmother. In doing so, the court found that despite the mother's ability to care for her children, she had a history of choosing partners "who do not have that ability, and who hurt her children."[1] (Emphasis omitted.) The mother appeals, claiming the court erred in finding that the children could not be returned to her home and that placement with the grandmother was in their best interests. Following our de novo review of the record, we affirm the court's permanency decision under Iowa Code section 232.104(2)(d)(2) and (4) (2025).

## I. Background Facts and Proceedings

This family came to the department's attention in November 2021 on a report that the mother was using drugs in the presence of her two children, A.N. and A.D. During the investigation, seven-month-old A.D. was found unresponsive at the mother's home and transported to the hospital. Medical professionals determined her injuries were non-accidental and consistent with abusive head trauma. The mother was unable to explain the injuries, as the child had been in the care of the mother's then-girlfriend when they occurred. While at the hospital,

---

[1] Together, the mother and her spouse have eight children. The spouse entered the marriage with four children, and the mother brought two children of her own. During the marriage, each parent had one child. At the time of these proceedings, the two children born during the marriage were at the adjudication stage, while the remaining six children were at the permanency stage. This appeal concerns only the mother's two children born before the marriage. Their father does not appeal.

A.D. tested positive for THC.  The mother admitted that she used marijuana but denied using any other substances.  There were also unexplained injuries to A.N.—an adult-sized bite mark on his thigh and large bruising on his back.  The children were removed from the mother's custody and placed with their father.

Less than a month later, A.N. tested positive for methamphetamine and THC.  The father was tested soon after and was also positive for both substances.  As a result, the children were removed from his custody and placed with their paternal grandmother under the department's supervision.  The children were adjudicated in need of the court's assistance in March 2022.

After her children's removal, the mother consistently engaged in court-ordered services, though she still had contact with the girlfriend who was criminally charged with injuring A.D.  But by the permanency hearing in May 2023, the mother had ended that relationship and made "measurable efforts" to reunify with her children.  She completed treatment for substance use, provided clean drug tests, and regularly attended mental health therapy.  She was also employed full-time and had stable housing.  And she was "absolutely amazing" with her children during their visits, according to the guardian ad litem.  With that progress, the juvenile court granted the mother a six-month extension to continue working towards reunification.

The mother continued to do well during the extension, although she started a new relationship that she kept secret from the professionals involved with her case.  In October—just as the children were transitioning back into her home—the mother got married and gave birth to another child.  The mother's new spouse was also involved in a juvenile court proceeding for her four children, and she was

pregnant with a child of her own. Despite these developments, the court returned custody of A.N. and A.D. to the mother in November but kept the case open to provide the family with continued support "[d]ue to all the new dynamics in the home."

In January 2024, the spouse gave birth to another child, bringing the number of children in the home to eight. One month later, A.N. suffered second-degree burns to his feet after being left unsupervised and turning on the hot water in the bathtub. In April, during an argument between the spouse and the mother, one of them threw a fan that scratched a child standing nearby, resulting in the removal of the spouse's four older children and child-endangerment charges for both parties. The mother and her spouse were evicted from their apartment because of the number of calls to the police, but they quickly secured a new residence. The couple also started marriage counseling.

Three months later, in July, the department received a report alleging the spouse had physically abused A.D., resulting in facial bruising. A.N. and A.D. were again removed from the mother's custody and placed with their paternal grandmother, where they have since remained. A child protective worker concluded the physical abuse report was founded, but a perpetrator was not identified. The mother and spouse claimed the bruising was from A.D. falling out of a chair. The children initially confirmed this account. But during the forensic interviews, A.N. disclosed that the spouse hits him "when he makes bad decisions." And when A.D. was being examined by a doctor, she reported that she was hit because she had peed on herself. The doctor confirmed that A.D.'s injuries—which included two black eyes, a knot and bruise on her forehead, and a

bruise on the left side of her face—were consistent with A.D.'s report and non-accidental.

After the children were removed, the department began providing a weekly visit for the couple with all eight of their children. These visits were chaotic and caused A.N. and A.D. to have behavior problems that spilled over into their school, daycare, and grandmother's home. A.N. told the workers who were supervising the visits that he did not want to attend them and that he remembered when the mother's spouse "would hit him and his sister and it makes him angry." The mother maintained the children were being coached by the department in their feelings towards her spouse, and she downplayed the safety concerns that workers observed at the visits. In a November report, the department recommended changing the permanency goal from reunification with the mother to a guardianship with the paternal grandmother.

At a permanency review hearing that lasted four days over a five-month period, the mother continued to insist that she and her spouse could care for all eight children and requested that A.N. and A.D. be returned to her custody. The juvenile court disagreed and transferred guardianship of the two children to the paternal grandmother. The mother appeals.

## II.     Standard of Review

Child-in-need-of-assistance proceedings are reviewed de novo. *In re D.M.*, 965 N.W.2d 475, 479 (Iowa 2021). "In doing so, we give the juvenile court's factual findings weight, but we are not bound by them. Our paramount consideration is protecting the child's best interests." *Id.* (cleaned up).

## III. Analysis

During a permanency review hearing, the juvenile court "shall consider the child's need for a secure and permanent placement in light of any permanency plan or evidence submitted to the court and the reasonable efforts made concerning the child." Iowa Code § 232.104(1)(c). The permanency options available to the court after the hearing include an order "to return the child to the child's home," an extension of time to work towards reunification, an order directing the State to initiate termination proceedings, or an order transferring "guardianship and custody of the child to an adult relative." *Id.* § 232.104(2)(a)–(d).

If the juvenile court selects the last option, as it did here, the court must find convincing evidence that all the following apply:

> a. A termination of the parent-child relationship would not be in the best interest of the child.
> b. Services were offered to the child's family to correct the situation which led to the child's removal from the home.
> c. The child cannot be returned to the child's home.

*Id.* § 232.104(4). On the last element, our supreme court has stated that "[w]hen the evidence shows the child's return will not produce harm, the child is to be reunited with the custodial parent." *D.M.*, 965 N.W.2d at 480 (cleaned up).

In deciding to transfer guardianship of the children to the paternal grandmother, the juvenile court found that "despite the *ability* to care for her children, [the mother] has a history of choosing paramours who *do not have that ability*, and who hurt her children." The court concluded

> that the children cannot return home to [the mother] if [her spouse] is there. While [the mother] can raise these children *on her own*, the children are not safe if [the spouse] is there. The children cannot be returned to [the mother] because [she] has not shown she can keep

the children safe from the people she chooses to have around her children.

We agree.

This is an undeniably difficult situation. The record reflects that the mother and children share a loving bond. It is also evident that the mother can meet the children's needs when parenting them alone. However, the children's safety is compromised when the mother's care is expanded to a household that includes her spouse and six other children. In the eight months after the children were returned to the mother's custody, there were several concerning incidents: A.N. suffered second-degree burns to his feet due to lack of supervision; there was a domestic dispute between the mother and spouse that resulted in injury to a child; and there were multiple unexplained injuries to the children, including A.D. who sustained significant facial bruising with two black eyes. While minor injuries can be expected with young children, the frequency and severity of the harm reported here raises serious concerns.

Despite this, the mother disputes the court's finding that the children could not be returned to her home. She contends there is no evidence that A.D. was ever fearful of her spouse and no evidence that A.N. is currently afraid. The record, however, contains multiple indications that the children are still apprehensive about the spouse and the blended family. For instance, while A.N. has not explicitly expressed fear of the spouse since being placed with the grandmother, he still asks whether the spouse will be present at visits. The mother interprets this as evidence that he wants to see the spouse, but A.N.'s guardian ad litem stated that he asks about the spouse "because he is anxious and afraid."

Even without relying on the children's fear of the spouse, there is convincing evidence that the children have endured abuse that the mother refuses to acknowledge. *See In re J.S.*, 470 N.W.2d 48, 51 (Iowa Ct. App. 1991) (noting that a parent's refusal to accept responsibility for prior abuse is relevant in evaluating the parent's future ability to safely parent). Though the physical abuse allegations were not confirmed as to a specific perpetrator, the harm itself was well documented. The court was not required to determine with certainty that the spouse was the source of the abuse to conclude the environment is unsafe. The injuries occurred in the home, while the mother and her spouse were present—this alone supports the finding that returning the children would not be safe or in their best interests.

A.N. has also described being hit by the other children during group visits. Although professionals involved with the children describe them as "calm and sweet" in other settings, their behavior changes during visits with the six other children and the spouse. During those visits, "they're aggressive and [A.N.] kind of shuts down." The social worker's description of the group visits paints a chaotic picture of the children: "They don't listen to the parents, they hit each other, they cuss, they're all over the place, they're throwing things, they're climbing on things. I see the parents scrambling, trying to keep it under control." When offered direction on parenting techniques, the mother and spouse "don't respond well to feedback."

In contrast, A.N. and A.D. are well-behaved and genuinely enjoy the visits when they are alone with their mother. This contrast underscores the core concern. While the mother can parent these two children individually, the

environment created by her choices has proven to be unstable and damaging to the children's physical and emotional health. *See In re T.W.*, No. 23-0720, 2023 WL 5092919, at *2 (Iowa Ct. App. Aug. 9, 2023) (affirming a permanency order placing a child in the father's sole legal custody where the evidence showed "returning the child to the mother is likely to harm the child's progress in emotional and behavioral regulation"). The children were previously removed from the mother's custody because of a serious non-accidental injury to A.D., returned, and removed again within just eight months because A.D. was injured again.

Following placement with their grandmother, the children's teacher and principal observed a marked improvement in their school attendance and a decrease in previously observed inappropriate behaviors. By all accounts, the children are doing well with their grandmother. They now have a safe and stable home environment with consistent supervision. It would be against the children's best interests to prolong uncertainty while waiting to see whether the mother and spouse's household might one day become a safe environment. *See In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990) ("Children simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable.").

For these reasons, we find that the juvenile court's permanency decision to transfer guardianship to the paternal grandmother is supported by convincing evidence and in the children's best interests. We affirm.

**AFFIRMED.**