# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0061
Filed May 13, 2026

———————————

**In the Matter of the Guardianship of O.C.**

**E.C., Mother,**
Appellant.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable Jordan Brackey, Judge.

———————————

**AFFIRMED**

———————————

Shannon M. Hounshell of SMH Law, PLLC, Des Moines,
attorney for appellant mother.

Alexandra M. Nelissen of Advocate Law, PLLC, Clive, attorney
for appellee guardian S.K.

———————————

Considered without oral argument
by Tabor, C.J., Badding, J., and Telleen, S.J.
Opinion by Badding, J.

1

**BADDING, Judge.**

Within days of giving birth to O.C., the mother left the infant with Shawna—the mother's stepmother. The next month, Shawna filed a petition to be appointed as the child's temporary and permanent guardian. The mother consented to the guardianship at first but later moved to terminate the temporary guardianship that had been established. After a hearing, the juvenile court granted Shawna guardianship of O.C. under Iowa Code section 232D.204 (2024). The mother appeals.

## I.    Background Facts and Proceedings

O.C. was born in mid-July 2024. The mother and child were discharged from the hospital two days later. That evening, the mother asked her stepmother, Shawna, to watch the baby because the mother was not feeling well. Shawna claims that O.C. has been in her care since then. The mother disagreed, testifying that she picked the child up from Shawna on July 19 and cared for her until July 24. Messages between the two show that while the mother may have had the child on July 19, she brought O.C. back to Shawna the next day because the mother's boyfriend was "talking about going to the [car] races."

In the weeks that followed, the mother only asked about O.C. occasionally. Otherwise, her messages to Shawna were focused on other things—like the mother's health, problems at work, and her rocky relationship with her boyfriend. On August 15, Shawna petitioned for guardianship of O.C., alleging the mother "has demonstrated a lack of consistent parental participation in the life of the minor child and has demonstrated that she is not willing or able to act as the legal parent and caretaker of the child." In an ex parte order, the juvenile court appointed Shawna as emergency temporary guardian. The next week, the mother

2

signed an affidavit consenting to the guardianship because of "a physical or mental illness that prevents [her] from providing care and supervision" to O.C.

The mother's consent was short-lived. On September 5, she moved to terminate the temporary guardianship, alleging that she was "capable of taking care of [O.C.]" and that Shawna was refusing to let her see the child. The juvenile court set the mother's motion for hearing on September 11. But because of a health emergency that day—the mother had her gallbladder removed—the mother missed the hearing.

At the continued hearing in October, Shawna testified that the mother had seen O.C. only a handful of times since she was born. And on those visits—which were short—Shawna said the mother was on her phone. According to Shawna, the mother had not "shown any interest in taking care of the hourly day-to-day, minute-by-minute needs of a newborn." The mother testified differently. She maintained that when she signed the consent to the guardianship, she thought it meant that "if something happened to [her], that [O.C.] would be able to go to Shawna and [her] dad." The mother testified that there was nothing physically or mentally that would prevent her from caring for O.C. and that she wanted the child back.

In its December ruling, the juvenile court found the mother and Shawna had a "very complicated relationship," especially when it came to O.C. After reviewing 102 pages of Facebook messages between the two, the court was concerned about their credibility because of differences between the "messages and the testimony received." Finding "that both parties are hiding certain facts," the court relied on testimony from Lorrie—the mother's grandmother.

Lorrie testified that the mother, who tended "to lie a lot," had a long history of avoiding responsibility and would not be able to safely care for O.C. She was concerned about the mother's overall stability, noting that she was living in her short-term boyfriend's home, that she often changed jobs, and that she liked to just "[g]et in the car and go." The court found Lorrie "was highly credible" and relied on her testimony, noting O.C.'s "current situation" supported Lorrie's concerns about the mother:

> With difficulties mounting in her life, [the mother] decided that this was an inconvenient time for her to be a parent and that she could not care for [O.C.] Thus, she placed her child with Shawna. While she loves [O.C.] and truly cares for her daughter, this court is convinced that if this court were to return [O.C.] to her mother's care immediately, [the mother] would merely end up in another situation where she could not care for her daughter and that may put [O.C.] in a dangerous situation. Due to the lack of contact with [O.C.] and the lack of engagement since [O.C.] has been out of her care, this court does not feel that [the mother] has demonstrated any history of stability and ability to parent [O.C.] Having a safe and stable caregiver is in [O.C.'s] best interest.

With those findings, the court granted Shawna's petition to establish a guardianship under Iowa Code section 232D.204(2).[1] But the court was

---

[1] The court also found that a guardianship was appropriate under Iowa Code section 232D.204(1), which requires proof of a "de facto guardian" and "demonstrated lack of consistent parental participation in the life of the minor by the parent." We need not address this ground—although it is challenged by the mother on appeal—because we conclude that Shawna met her burden of proof under section 232D.204(2). *See In re Guardianship of J.M.*, No. 20-1638, 2021 WL 4304224, at *5 (Iowa Ct. App. Sep. 22, 2021) (stating that the two subsections in section 232D.204 "set forth alternative methods of proving the need for establishment of a guardianship").

We also find that error was not preserved on the mother's claim that the juvenile court erred in appointing an attorney rather than a court visitor for the child. Because the mother did not raise that issue in the guardianship proceedings, we decline to address it on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

hopeful that "the reasons for the guardianship could be eliminated in a relatively short period" by the mother "showing stability, showing an interest in parenting [O.C.] full-time, and demonstrating consistent parental participation." To that end, the court ordered the parties to engage in mediation "to establish a transition plan and visitation so that [the mother] has a clear, articulated plan to regain custody quickly."

The mother appeals, claiming the juvenile court's order violates her "constitutional rights and offends Iowa's preference for the natural parent." Entwined with that claim, the mother contends the court erred in finding that she "is unable or unwilling to exercise parental authority and a guardianship is not in the child's best interest."[2]

## II. Standard of Review

"Our standard of review of the establishment of a guardianship of a minor is de novo." *In re Guardianship of B.B.*, No. 21-0992, 2022 WL 523325, at *3 (Iowa Ct. App. Feb. 22, 2022). "We give weight to the juvenile court's factual findings, but we are not bound by them." *In re Guardianship of L.Y.*, 968 N.W.2d 882, 892 (Iowa 2022).

---

[2] The mother also challenges the court's failure to grant her motion to terminate the temporary guardianship. But any error in establishing that temporary guardianship cannot be remedied now. *See, e.g.*, *In re A.M.H.*, 516 N.W.2d 867, 871 (Iowa 1994) (finding that any error in granting a temporary ex parte removal order in a child-in-need-of-assistance case "cannot now be remedied. We cannot go back in time and restore custody based on alleged errors in the initial removal order"). And because this was a proceeding to *establish* a guardianship, we are not concerned with the requirements to *terminate* a guardianship—which the mother asserts she met. *Cf.* Iowa Code § 232D.503(3) (setting out the requirements to "terminate a guardianship established pursuant to section 232D.204").

## III. Analysis

At the outset, the mother asserts that she "has a fundamental liberty interest in the child's care, custody, and control" and that it "should be presumed that she will act in the best interest of her child." *See id.* at 896 (discussing "the well-established parental preference in guardianship cases"). The juvenile court recognized this parental preference but found it was rebutted by the evidence Shawna offered to prove that a guardianship should be established under Iowa Code section 232D.204(2). We agree. *See In re E.B.*, No. 23-0486, 2023 WL 6620521, at *6 (Iowa Ct. App. Oct. 11, 2023) ("The presumption is rebutted if the parent is not suitable and the child's best interests requires that the child remain in a non-parent's care.").

Section 232D.204(2) allows the juvenile court to appoint a guardian for a minor child without parental consent

> if the court finds by clear and convincing evidence all of the following:
>
> a. No parent having legal custody of the minor is willing or able to exercise the power the court will grant to the guardian if the court appoints a guardian.
>
> b. Appointment of a guardian for the minor is in the best interest of the minor.

In challenging this ground, the mother focuses on her grandmother's testimony, arguing that Lorrie "had not been in a situation where she knew the mother intimately since [Lorrie] was a temporary foster placement years ago when [the] mother was still a teenager." The record shows otherwise.

Lorrie testified that she had a close relationship with the mother and talked to her "pretty much every day" on the phone. Their conversations while the mother was pregnant led Lorrie to believe that the mother—who was twenty-one years old—was not mature enough to raise the baby. The

6

mother was living with O.C.'s father in Illinois from August 2023 until New Year's Eve in December of that year, when she learned that her mother was in a fatal car accident. The mother returned to Iowa, moving in with Shawna and her father. While in Iowa, the mother met her boyfriend through Facebook. After dating him for about two months, the mother moved into his house. Lorrie visited the house before O.C. was born and said it "was not good." The mother acknowledged the house "was a mess" but testified that she cleaned it after O.C. was born. She also acknowledged that the house had been broken into and that there was a mouse problem, although she said both issues had been remedied.

Shawna testified the mother fought with her boyfriend "all the time." The mother's Facebook messages to Shawna support that testimony. About a week after O.C. was born, the mother sent Shawna a message complaining about her boyfriend yelling at her and saying she couldn't "handle this anymore." In other messages, the mother worried that her boyfriend was using her for the money that she was earning at a new job. The mother agreed that her relationship with her boyfriend was "up and down." The mother's employment status was also fuzzy, with the mother testifying that she had been employed at a nursing home for two months. But in a financial affidavit the mother completed during that time, the mother did not mention the nursing home job and said that she was instead working at a convenience store. At the hearing, the mother testified that she was fired from the store after working there for two weeks. While the mother occasionally offered to help Shawna financially with O.C., she also asked Shawna for money and food.

Against this somewhat chaotic backdrop, the mother's visits with O.C. were sporadic. Shawna testified that although the mother occasionally asked

to visit O.C., she would often fail to show up. Shawna estimated the mother saw O.C. twice in August, once in September for about twenty minutes, and once in October. *See In re Guardianship of L.W.*, No. 23-1725, 2024 WL 3688590, at *3 (Iowa Ct. App. Aug. 7, 2024) (expressing concern about the mother's "inability to successfully assume the parental role for as short a period as one-hour visitations" with the child). While the mother alleged that Shawna refused to let her see O.C., the messages between them do not support that allegation. The only times that Shawna said no were when she was sick or had other appointments. The record supports the juvenile court's conclusion that the mother "took a vacation from her parenting responsibilities," preferring to leave O.C.'s daily care to Shawna. *See E.B.*, 2023 WL 6620521, at *7 (noting the parental preference for custody is "lost when a parent takes 'an extended holiday from the responsibilities of parenthood'" (citation omitted)). We agree with the court that Shawna proved by clear and convincing evidence the mother was not willing or able to fulfill the role of parent and guardian to O.C. *See* Iowa Code § 232D.204(2)(a).

We also agree that appointing Shawna as O.C.'s guardian is in the child's best interest. *See id.* § 232D.204(2)(b). The mother's living situation, relationship, and finances are unstable. On top of those concerns, O.C. seemed to be an afterthought for the mother, who only asked to visit with her when she was "bored" or had nothing else going on. We do not doubt the mother's love for O.C. But as our supreme court has said in the child welfare context, "Children simply cannot wait for responsible parenting. Parenting cannot be turned off and on like a spigot. It must be constant, responsible, and reliable." *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990).

For these reasons, we affirm the juvenile court's order appointing Shawna as O.C.'s guardian under Iowa Code section 232D.204(2).

**AFFIRMED.**